**Wallace INGALLS, et al., Plaintiffs,**

v.

**James FLORIO, et al., Defendants.**

**Civil Action No. 92–2113 (JEI).**

United States District Court,
D. New Jersey.

June 13, 1997.

---

ment on plaintiffs' legal access claims and free exercise claims.

## I. BACKGROUND

These are forty-three consolidated actions commenced variously in 1992 and 1993 on behalf of former and present inmates of CCCF. The plaintiffs include pretrial detainees, inmates serving county-jail sentences, and state-sentenced inmates held at CCCF despite eligibility for transfer to a New Jersey state prison.

The present cases present many issues related to a class action filed in 1982 concerning conditions at CCCF and its predecessor, the Camden County Jail. *See Camden County Jail Inmates v. Parker,* 123 F.R.D. 490 (D.N.J.1988) *Inmates v. Parker* remained unresolved when the present individual actions were filed, and this Court therefore stayed the present actions pending the outcome of *Parker. See Ingalls v. Florio,* No. 92–2113 (D.N.J. Mar. 13, 1994) (order staying proceedings). Events in the *Parker* case have extended over a decade, with both County defendants and those defendants who are state officials entering into several consent decrees designed to alleviate overcrowding at the Camden County Jail and, subsequently, at CCCF, by removing state-sentenced inmates to other institutions. However, these various plans remained unfulfilled until a final consent decree in *Parker* was fashioned in late 1994.

Ian Stuart by Daniel J. de Luca, Audobon, NJ, for Plaintiffs.

Robert G. Millenky, County Counsel by M. Lou Garty, Assistant County Counsel, Camden, NJ, for Camden County Defendants.

## OPINION

IRENAS, District Judge:

Presently before the Court is the summary judgment motion of those defendants who are officials of Camden County, employees of the Camden County Correctional Facility ("CCCF"), or employees of the provider of medical care at CCCF (collectively, "the County defendants"). For the reasons set forth below, the Court will deny the County defendants summary judgment on plaintiffs' conditions of confinement claims and medical care claims, and grant them summary judg-

Following the apparent settlement of *Parker,* this Court vacated the stay governing the present individual cases. *See Ingalls,* No. 92–2113 (D.N.J. May 12, 1995) (order vacating stay). The inmate plaintiffs herein had sought to maintain their claims as a class action, but this Court denied them class certification. *See Ingalls,* No. 92–2113 (D.N.J. Sept. 23, 1993) (order denying class certification). Nonetheless, the Court consolidated these actions for purposes of discovery and motion practice. *See Ingalls,* No. 92–2113 (D.N.J. Mar. 15, 1994, Mar. 23, 1994, Apr. 21, 1994, Apr. 28, 1994, and May 6, 1994) (orders consolidating actions for limited purposes).

The County defendants now move for summary judgment in all forty-three remaining cases, primarily on the grounds that they

cannot be held liable on a theory of *respondeat superior* and that the factual bases of plaintiffs' claims do not fulfill the elements of the applicable substantive law. For purposes of the discussion below, the Court will divide plaintiffs' substantive claims into four categories: (1) claims concerning general conditions of confinement, including safety from assault by corrections officers or inmates; (2) claims concerning medical care; (3) claims concerning access to the courts; and (4) claims concerning free exercise of religion.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A non-moving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890–91 (3d Cir. 1992).

It is not the role of the judge at the summary judgment stage to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court must draw all inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, the Court must accept the non-movant's version as true. *See Pastore v. Bell Tel. Co.* 24 F.3d 508, 512 (3d Cir.1994).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue of material fact for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring).

### B. *Respondeat Superior Liability*

The County defendants, who are all supervisory personnel or political officials, generally assert that they cannot be held liable on plaintiffs' claims because they were not "aware of the needs" of particular plaintiffs, did not have "personal knowledge" of particular conditions of confinement, or did not have "personal contact" with plaintiffs. *See, e.g.,* County Defendants' Reply Brief re Archer at 1–3. The plaintiffs, however, allege that the County defendants were well aware of overall conditions at CCCF because of these defendants' involvement in the *Inmates v. Parker* class action, and because the longstanding difficulties with overcrowding and substandard conditions at CCCF were a matter of common knowledge. *See, e.g.,* Archer Brief at 2–6.

Supervisory personnel or administrators cannot be liable for damages under § 1983 on a theory of respondeat superior; rather, they must have played some personal role in causing a plaintiffs alleged harms. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A civil rights plaintiff must establish an "affirmative link" between the claimed deprivation and the official sued. *See Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *cf. Board of County Comm'rs v. Brown*, — U.S. ——, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (discussing supervisory liability in § 1983 actions in context of excessive-force claims against police).

■ There is no question that defendants acting in a supervisory capacity can be held liable in § 1983 actions under a theory that it was their own actions which resulted in the constitutional violations. *See, e.g., Dimarzo v. Cahill,* 575 F.2d 15 (1st Cir.1978) (citing a Commissioner of Correction's failure to fulfill his own statutory duty to promulgate and enforce minimum standards of care and custody). In addition, the fact that a supervisor promotes a policy which infringes upon the constitutional rights of an inmate can be the "affirmative link" contemplated by the Supreme Court in *Rizzo.* "It is not necessary for § 1983 liability that the [defendants] directed any particular action....only that they *affirmatively* promoted a policy which sanctioned the type of action which caused the violations." *Duchesne v. Sugarman,* 566 F.2d 817, 831 (2d Cir.1977). Promulgation of an offending policy or procedure amounts to sufficient personal participation in the constitutional violation to give rise to individual liability on the part of the supervisory official. *See Wanger v. Bonner,* 621 F.2d 675 (5th Cir.1980).

■ Here, the allegations against the County defendants set forth theories of personal responsibility for conditions at CCCF that are sufficient to overcome these defendants' request for summary judgment based on the issue of *respondeat superior* liability. Plaintiffs clearly maintain that either (1) the County defendants had direct knowledge of the various allegedly unconstitutional conditions at CCCF that resulted in plaintiffs' harms; or (2) the County defendants persisted in promoting the policies that inevitably resulted in the unconstitutional conditions. Those theories, and the history of the long-running CCCF dispute which plaintiffs cite as factual support, might permit a jury to impose liability upon the County defendants under the doctrines of *Monell* and *Rizzo.*

**C.  General Conditions Claims**

Plaintiffs allege that their most basic human needs for sanitation, recreation, uncontaminated food, minimally sufficient housing space, and personal safety were not met during their periods of incarceration at CCCF. *See, e.g.,* Archer Brief at 1–2. The County defendants respond that plaintiffs cannot demonstrate the necessary elements of these claims. *See, e.g.,* County Defendants' Brief re Archer at 13–15. Further, as to three particular plaintiffs—Cream, Frazier, and Torres—the County defendants assert that their claims are barred by the applicable statute of limitations. In turn, the Court will discuss (1) the sufficiency of plaintiffs' claims concerning basic human needs (other than personal safety); (2) the sufficiency of plaintiffs' claims concerning assaults by corrections officers or inmates; and (3) the timeliness of the claims of plaintiffs Cream, Frazier, and Torres.

**1.  Basic Human Needs**

A conditions-of-confinement claim may be cognizable under the Eighth or Fourteenth Amendment [1] if the alleged conditions, alone or in combination, deprive inmates of the minimal civilized measure of life's necessities or result in unquestioned and serious deprivations of basic human needs. *See Wilson v. Seiter,* 501 U.S. 294, 305, 111 S.Ct. 2321, 2327–28, 115 L.Ed.2d 271 (1991); *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399–2400, 69 L.Ed.2d 59 (1981). Human needs protected by the Eighth Amendment include habitable shelter, sanitation, nutrition, and exercise. *See Wilson,* 501 U.S. at 304–05, 111 S.Ct. at 2327–28; *Rhodes,* 452 U.S. at 341–43, 347–48, 101 S.Ct. at 2396–97, 2399–2401; *Hutto v. Finney,* 437 U.S. 678, 682–88, 98 S.Ct. 2565, 2569–72, 57 L.Ed.2d 522 (1979); *Nami v. Fauver,* 82 F.3d 63, 65–67 (3d Cir.1996); *Young v. Quinlan,* 960 F.2d

---

**1.** Plaintiffs were incarcerated at CCCF variously as state-sentenced inmates, county-sentenced inmates, or pretrial detainees. With respect to conditions of confinement, pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment and convicted prisoners are protected by the Eighth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 545, 99 S.Ct. 1861, 1872 n. 16, 1877, 60 L.Ed.2d 447 (1979).

The standards under the Due Process Clause are the same as standards under the Eighth Amendment for measuring conditions and medical treatment. *See id.* at 544, 99 S.Ct. at 1876–77. Accordingly, for the sake of simplicity, this Court will refer to these Eighth and Fourteenth Amendment claims collectively as Eighth Amendment claims.

351, 355, 364 (3d Cir.1992); *Tillery v. Owens*, 907 F.2d 418, 426–28 (3d Cir.1990); *Peterkin v. Jeffes*, 855 F.2d 1021, 1025–26, 1025 n. 7 (3d Cir.1988); *Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 999 (3d Cir.1983). Although not Eighth Amendment violations *per se*, double-celling or overcrowded conditions are cruel and unusual punishment when they lead "to deprivations of essential food, medical care, or sanitation," or when they cause an "increase [in] violence among inmates or create other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400; *see also Nami*, 82 F.3d at 67.

■ To state a claim for violation of the Eighth Amendment, an inmate must allege both an objective element and a subjective element. First, an inmate must show that the deprivation caused by the prison official's act or omission is sufficiently serious to result in the denial of the minimal civilized measure of life's necessities. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson*, 501 U.S. at 305, 111 S.Ct. at 2327–28; *Nami*, 82 F.3d at 67. Second, an inmate must demonstrate that prison officials acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson*, 501 U.S. at 305, 111 S.Ct. at 2327–28; *Nami*, 82 F.3d at 67.

To establish the subjective component of an eighth-amendment claim—deliberate indifference—an inmate must show that a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847, 114 S.Ct. at 1984. "The long duration of a cruel prison condition may make it easier to establish knowledge and hence some form of intent." *Wilson*, 501 U.S. at 300, 111 S.Ct.

at 2325 (citation omitted). Deliberate indifference can be inferred from evidence that letters were sent by inmates to prison administrators informing them that conditions significantly increased the possibility of serious harm. *See Nami*, 82 F.3d at 67–68. Because a party's state of mind is inherently a question of fact, state of mind is typically not a proper issue for resolution on summary judgment. *See Young*, 960 F.2d at 360 n. 21.

Several of the general conditions alleged to prevail at CCCF during plaintiffs' periods of incarceration were severe enough to constitute possible deprivations of the minimal civilized measure of life's necessities. For example, overcrowding was extreme: many plaintiffs allege not merely double- or even triple-celling, but the routine housing of five or six inmates in cells designed for only one or two persons. Plaintiffs say that they slept on the floor, not occasionally or in emergencies, but continually, for periods as long as eleven months. *See, e.g.,* Bowman, Conn, Evans, Green, Jackson, and Russell General Interrogs. ¶ 5(a) and Conditions of Confinement Interrogs. ¶ 1(a).[2] Most plaintiffs describe deplorable conditions of sanitation. For example, toilet paper in such short supply that inmates repeatedly engaged in physical fights over this seemingly basic commodity. *See, e.g.,* Conn, Evans, and Frazier General Interrogs., ¶ 5(a) and Conditions of Confinement Interrogs. ¶ 2(b). Food storage and preparation areas reportedly were infested with vermin, including mice and rats, which led to bacterial contamination of inmates' meals. *See, e.g.,* Frazier General Interrogs. ¶ 5(a). Many plaintiffs claim that opportunities for recreation were so limited in amount as to effectively deny them any physical exercise. In several instances, plaintiffs specifically allege that they received no outdoor recreation whatsoever for time periods in excess of a year. *See, e.g.,* Conn, Frazier, and Pratt General Interrogs. ¶ 5(a).

**2.** The specific factual allegations of each plaintiff are contained in his answers to interrogatories propounded jointly by all defendants. The complete texts of interrogatories and answers are set forth as Exhibits B to the County defendants' forty-three opening briefs separately addressing the claims of each plaintiff. The interrogatories are divided into seven sections

(General, Medical, Conditions of Confinement, Assaults by Corrections Officers, Assaults by Other Inmates, Legal Access, and Religious Access), with paragraphs numbered separately within each section. Therefore, the answers to interrogatories will be cited by name of plaintiff, name of relevant section, and paragraph number.

The overcrowding and the concomitant problems of sanitation, inadequate recreation, and other possible substandard conditions of confinement were, as plaintiffs note, precisely the subject of the litigation which had continued for approximately a decade prior to the specific events at issue here. *See, e.g.,* Archer Brief at 2–6. The County defendants, as administrators and elected officials, were involved in, or presumably at least informed about, the various negotiations to resolve the litigation. Therefore, it would appear possible that a jury would find that these defendants had a level of knowledge indicating deliberate indifference to plaintiffs' plight. *See Farmer,* 511 U.S. at 847, 114 S.Ct. at 1984; *Nami,* 82 F.3d at 67–68. Plaintiffs have thus demonstrated that a reasonable jury might accept their claims regarding deprivations of basic human needs. The Court will deny the County defendants' motion for summary judgment on these claims accordingly.

### 2. Assaults by Corrections Officers or Inmates

Prisoner civil-rights actions commonly present two types of claims based on assaults: (1) excessive-force claims arising from assaults by corrections officers; and (2) failure-to-protect claims arising from assaults by other inmates. To state a claim under the Eighth Amendment based on the use of excessive force, a plaintiff must show that "officials applied force maliciously and sadistically for the very purpose of causing harm" or that "officials used force with a knowing willingness that [harm would] occur." *Farmer,* 511 U.S. at 835–36, 114 S.Ct. at 1978. The core judicial inquiry is thus "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992).

■ To prevail on a failure-to-protect claim, an inmate must first satisfy an objective requirement by showing that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977. Then, an inmate must satisfy a subjective element and show that the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837, 114 S.Ct. at 1978. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842, 114 S.Ct. at 1981. An inmate is not required to give advance notice to officials of the risk of harm, and actual knowledge of the risk can be inferred by the trier of fact from circumstantial evidence of the obviousness of the risk. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence....and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." *Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir. 1985) (citation omitted).

■ Applying *Farmer,* the Court thus first asks whether there is a genuine factual dispute that inmates at CCCF generally, or whether the plaintiffs in particular, faced a substantial risk of assault. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then summary judgment must be denied. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Second, the Court asks whether the County defendants' submissions have foreclosed the possibility that reasonable jurors could find that these defendants were aware of and disregarded the risk that plaintiffs faced.

According to plaintiffs' recitations of the relevant facts, there were repeated serious assaults on CCCF inmates, by both guards and other inmates, during the period of time when plaintiffs were housed at CCCF. Perhaps the most notorious instance of uncontrolled violence was a riot that occurred at CCCF on March 3, 1992, which, according to some plaintiffs, was caused by longstanding racial tension among groups of inmates. In

particular, three plaintiffs claim that they were seriously injured in the March 1992 riot, suffering, *inter alia*, fractures of the nose, teeth, other facial bones, and ribs. See Archer, Russell, and Sheller General Interrogs. ¶ 5(a) and Medical Interrogs. ¶ 2. In addition to the March 1992 riot, other more isolated instances of violence are the subjects of claims by particular plaintiffs. For example, plaintiff Billingsly describes an incident in which a corrections officer deliberately poisoned Billingsly's food with soap containing lye. See Billingsly General Interrogs. ¶¶ 5(a)–(b). The County defendants "do not dispute" the truth of Billingsly's account. See County Defendants' Brief re Billingsly at 2. Plaintiff Stefano asserts that, despite an order for his placement in segregated housing, he apparently was placed in general population. There, he was brutally assaulted by two cellmates, resulting in multiple facial fractures requiring major surgery on three occasions. See Stefano General Interrogs. ¶ 5(a) and Medical Interrogs. ¶¶ 4, 5.

Plaintiffs' various allegations of assaults by guards or inmates, including the foregoing examples, tend to have a mutually reinforcing effect in establishing the possible existence of a risk of harm from such violence. That is, the chronologically earlier instances of assaults may reasonably be considered by a jury as indicating a serious risk which defendants did not act to eliminate. *See Riley,* 777 F.2d at 147 (permitting pervasive risk to be established by "much less than proof of a reign of violence and terror"). Significantly, the County defendants have not presented any evidence *concerning the steps,* if any, they took to lessen the risk of violence at CCCF during the early 1990's. This absence of information leaves open the possibility that the County defendants could be found to have shown deliberate indifference to plaintiffs' safety. The Court will thus deny the County defendants's motion for summary judgment on this issue, as well.

### 3. Statute of Limitations—Cream, Frazier, and Torres

▪ The statute of limitations for a § 1983 action is determined by reference to the relevant state's limitation period for personal-injury claims. *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Under New Jersey law, the applicable limitation period for § 1983 cases thus would be two years. *See* N.J.S.A. § 2A:14–2; *Craig v. Ewing Township,* 678 F.Supp. 1106 (D.N.J.1988). However, depending upon individual circumstances, the limitation period for a specific § 1983 claim may not always end precisely two years after the event at issue. For example, the limitation period does not begin to run until a plaintiff knows or has reason to know of the injury which forms the basis of the claim. *See Cox v. Stanton,* 529 F.2d 47 (4th Cir.1975); *cf. Thomas v. New York City,* 814 F.Supp. 1139, 1153 (E.D.N.Y.1993). Further, continuing violations of a plaintiff's civil rights, although they may have begun at a point in time beyond the reach of the normal limitation period, may extend into the relevant period and therefore may give rise to potential liability. *See, e.g., Jackson v. Galan,* 868 F.2d 165 (5th Cir.1989) (considering repeated garnishments of wages by public officials separate acts in violation of § 1983, most of which extended into limitation period); *Anthony v. County of Sacramento,* 845 F.Supp. 1396 (E.D.Cal.1994) (considering repeated acts of employment discrimination continuing violations extending into the limitation period).

The County defendants have argued that some or all of the claims of plaintiffs Cream, Frazier, and Torres are barred by the applicable two-year statute of limitations. Specifically, these defendants note that plaintiff Cream claims injuries arising from failure to provide medical care after an assault by another inmate on December 1, 1991; however, according to defendants, since Cream's complaint was not filed until December 6, 1993, the limitation period had expired. *See* County Defendants' Brief re Cream at 1–2, 14, Ex. C. As to plaintiff Frazier, the County defendants argue that Frazier complains of insufficient medical care for illnesses or injuries that occurred in 1990, but that he did not file his complaint until December 6, 1993. *See* County Defendants' Brief re Frazier at 1–2, 9, Ex. C. Finally, as to plaintiff Torres, the County defendants maintain that the events underlying his complaint occurred in 1987— well over five years before he filed his com-

plaint in December 1993. *See* County Defendants' Brief re Torres at 6–7.

As to plaintiffs Cream and Frazier, the Court rejects the County defendants' statute-of-limitations arguments. Plaintiff Cream asserts that the denial of medical care arising from an assault on December 1, 1991 was an ongoing violation, and that therefore his December 6, 1993 complaint was timely filed. *See* Cream Brief at 22. Particularly in view of the fact that Cream's complaint was filed within a few days of the two-year anniversary of the incident in question, the Court finds that a theory of ongoing violation plausibly applies to extend the limitation period to allow his claim to survive. Similarly, plaintiff Frazier overcomes any assertion that his claims are time barred. Indeed, in Frazier's case, the very documents relied on by the County defendants for their statute-of-limitations argument demonstrate possible violations of plaintiff's right to medical care well within the limitations period. That is, plaintiff Frazier's CCCF medical records clearly indicate that Frazier repeatedly sought medical care for back pain in June and July 1993, only a few months prior to the filing of his complaint that December. *See* County Defendants' Brief re Frazier at Ex. C. Thus, the Court will deny the County defendants' motion to dismiss the condition claims of plaintiffs Cream and Frazier as time-barred.

However, a different result follows as to plaintiff Torres. Torres alleges that at CCCF he suffered cold temperatures, delays in medical care for unspecified illnesses, and inadequate portions of food. *See* Torres General Interrogs. ¶ 5(a) and Conditions of Confinement Interrogs. ¶ 1. In his interrogatory answers, Torres grounds his claims entirely upon events occurring during his incarceration at CCCF from March 1987 to June 1987. See Torres General Interrogs. ¶ 8(a). The County defendants rightly note that the 1987 incarceration ended some five and one-half years before Torres filed his complaint in December 1993. *See* County Defendants' Brief re Torres at 6–7. Although it appears that, in addition to his 1987 confinement, Torres was also confined at CCCF for three days in February 1993, *see* County Defendants' Brief re Torres at Ex. A, Torres does not specifically claim any injuries arising from the 1993 incarceration. Further, Torres does not argue that his claims fall within any exception to the normal limitation period due to ongoing violations or difficulty in discovering his potential causes of action. Therefore, the Court will grant the County defendants' motion to dismiss plaintiff Torres's complaint as untimely.

### D. Medical Care Claims

"Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Township of Manalapan*, 47 F.3d 628, 636–37 (3d Cir.1995). A medical need is serious "if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention;" "if unnecessary and wanton infliction of pain … results as a consequence of denial or delay in the provision of adequate medical care;" or "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988) (citations and internal quotation marks omitted). "[D]enial of medical care … result[ing] in pain and suffering [that] no one suggests … serve[s] any penological purpose … is inconsistent with contemporary standards of decency.…and thus violates the [E]ighth [A]mendment." *Id.* at 348 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)).

Plaintiffs claim that they received inadequate or no medical care for certain injuries and sicknesses they encountered while confined at CCCF. *See, e.g.,* Evans Brief at 16–17. Defendants respond that plaintiffs received adequate treatment and that plaintiffs therefore are merely second-guessing the treatment provided by their licensed physicians. *See, e.g.,* County Defendants' Brief re Evans at 9–10. Because a question of fact

remains as to the treatment plaintiffs received, the Court will deny the County defendants' motion for summary judgment on the medical care issue.

Plaintiffs allege that they suffered in some cases quite severe illnesses and injuries while at CCCF. *See, e.g.*, Boyd, Lavin, and Pratt General Interrogs. ¶ 5. For example, one plaintiff states that he had a steel plate in his jaw from previous surgery to correct a fracture. While he was confined at CCCF, the screw securing the plate became loose, cut through plaintiff's gum, and caused a severe infection. This plaintiff further alleges that, despite putting in medical request slips two or three times a day, he was not seen for at least two weeks, and then by a nurse rather than a doctor. *See* Boyd General Interrogs. ¶ 5. Another plaintiff contracted tuberculosis while at CCCF but received no medical treatment for a month. *See* Lavin General Interrogs. ¶ 5. Still another plaintiff fractured his right hand but did not see a doctor for fifteen days and did not receive an x-ray for over five weeks. *See* Pratt General Interrogs. ¶ 5. Several plaintiffs claim that permanent damage resulted from their delayed or improper medical treatment. *See, e.g.*, Lavin and Pratt General Interrogs. ¶ 5 (alleging, respectively, a partially destroyed lung and permanent right-hand disfigurement).

Indeed, the foregoing cases do not even represent the most severe examples of claims of untreated medical problems. Plaintiff Stefano alleges that he sustained multiple facial fractures in a brutal attack by his cellmates in March 1992, requiring extensive surgical repair. See Stefano Medical Interrogs. ¶ 1(a). Stefano asserts that he was advised by a doctor that he had to sleep with his head elevated to permit proper healing of the fractures. Despite this medical advice, Stefano says, he still was forced to sleep on the floor and not given any means to elevate his head; nor did he receive pain medication. *See id.* ¶ 3(a).

Another plaintiff, Zold, explains that he had only one kidney at the time when he was incarcerated at CCCF, and CCCF officials were aware of this condition. However, when Zold complained that he was urinating blood and suffering excruciating pain, he was not taken to the hospital until after he contacted a newspaper. *See* Zold General Interrogs. ¶ 10 and Medical Interrogs. ¶ 1(a). He says that he then remained in the hospital for three weeks with a kidney infection. Even while he was hospitalized, guards would not let him use the toilet when he needed to urinate. *See* Zold Medical Interrogs. ¶ 4.

The above examples, and the medical-care allegations of other plaintiffs, clearly fulfill the criteria of serious medical needs. In fact, the County defendants do not seem to dispute plaintiffs' needs for medical care. Typically, the County defendants assert that they gave plaintiffs the medical treatment that was required, relying upon internal CCCF records of the purported treatments. *See, e.g.*, County Defendants' Brief re Stefano at 9, Ex. C (claiming that Stefano was given various pain medications after sustaining his facial fractures). These factual disputes over issues of material fact cannot be decided by this Court on summary judgment; rather they are best left to a jury to decide at trial. Therefore, because these questions of fact remain concerning the County defendants' provision of medical care to plaintiffs, the Court will deny the County defendants' motion for summary judgment as to this issue as well.

### E. *Legal Access Claims*

■ Prisoners have a fundamental right of access to the courts which requires prison authorities to provide adequate law libraries or adequate assistance from persons trained in the law. *See Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Formerly, courts had drawn a distinction between "ancillary" and "core" *Bounds* claims, with only ancillary claims requiring an allegation of some "actual injury," *i.e.*, the dismissal of an action or a denial of relief. *Bieregu v. Reno*, 59 F.3d 1445 (3d Cir.1995). However, the Supreme Court more recently has held that "actual injury" is a necessary element of all claims of violation of an inmate's right of access to the courts. *See Lewis v. Casey*, —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). In *Casey*, the

Court defined "actual injury" as a hindrance to an inmate's efforts to pursue some non-frivolous legal action. *Id.* at —— ——, 116 S.Ct. at 2180–81.

▉ Thus, to state a legal access claim under *Bounds,* an inmate must demonstrate that the shortcomings in a prison law library or legal assistance program resulted in the dismissal of the inmate's complaint—for example, for failure to satisfy some technical requirement of which he could not have known—or that a law library was so inadequate that the inmate could not file a complaint arising from an arguably actionable harm. *See Casey,* —— U.S. at ——, 116 S.Ct. at 2180. *Casey* requires that an inmate can only demonstrate "actual injury" if an inmate's legal action is a direct or collateral attack upon his sentence, or it is a challenge to the conditions of his confinement. *See id.* at —— —— ——, 116 S.Ct. at 2181–82. Even where "actual injury" may be present, *Casey* cautions that in situations involving prison security—such as heightened restrictions on prisoners in disciplinary lockdown—certain regulations may impinge upon inmates' constitutional right of access but nonetheless be valid: these must be " 'reasonably related to legitimate penological interests.' " *Id.* at ——, 116 S.Ct. at 2185 (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *see also Penrod v. Zavaras,* 94 F.3d 1399 (10th Cir.1996) (permitting reasonable limits on prisoners' access to law library where security problems existed).

▉ The County defendants argue that because plaintiffs have failed to "articulate what violation occurred, by whom and when such acts occurred," they are entitled to summary judgment. *See, e.g.,* County Defendants' Brief re Bush at 14. Plaintiffs respond that material issues of fact exist as to the extent of denials of access to the law library and other forms of legal assistance, and that summary judgment would therefore be premature. *See, e.g.,* Bush Brief at 20–22.

Because none of the plaintiffs allege any actual injury, the Court will grant County defendants summary judgment as to their legal access claims.

Nineteen of the forty-three plaintiffs claim legal access violations. Many of these allege only that they could not go to the library, or were not permitted to go as often as they would have liked. *See, e.g.,* Bush, Evans, Hines, Merlo and Vautier Legal Access Interrogs. ¶ 1. However, these plaintiffs fail to satisfy the "actual injury" requirement from *Casey.* Some of these plaintiffs fail to demonstrate that they were working on any cases in particular or were barred from filing a complaint. Others fail to claim that their inability to go to the law library had any effect whatsoever on any pending legal matter. Accordingly, the Court will grant the County defendants summary judgment on these claims.

Other plaintiffs assert that limitations on their use of the law library had the effect of impairing their ability to assist in their own defense. *See, e.g.,* Archer, Bowman, Gillis, and St. John Legal Access Interrogs. ¶ 1. However, criminal defendants generally assist their counsel with fact issues only, not by doing legal research, and so these claims do not satisfy the *Casey* "actual injury" requirement either. The Court will grant the County defendants summary judgment on these claims because plaintiffs, including inmate Merlo who claims he was defending himself *pro se,* do not indicate, as they must under *Casey,* that some nonfrivolous action attacking their sentences or challenging their conditions of confinement was dismissed or could not be filed because of library restrictions. Without some such allegation, plaintiffs do not present a plausible *Bounds* claim of denial of access to the courts.[3]

Several plaintiffs claim that they could not make telephone calls to their lawyers and that therefore their right to legal access was violated. *See, e.g.,* Billingsly, Jackson, and Rodriguez Legal Access Interrogs. ¶ 1. Such

---

**3.** Plaintiff R. Davis does assert that his inability to go to the law library made him unable to challenge an allegedly invalid plea bargain. *See* R. Davis Legal Access Interrogs. ¶¶ 1–3. However, the Court will dismiss this claim because there is documentary proof that the state court considered Davis's motion to withdraw his guilty plea and denied the motion on the merits. *See* County Defendants' Brief re R. Davis Ex. C (Judgment of Conviction dated August 24, 1993). Therefore, Davis was not completely unable to present his claim in the sense required by *Casey.*

limited access to telephone calls, however, is not a constitutional violation so long as inmates can communicate with their counsel in writing or in person by visits. *See Aswegan v. Henry,* 981 F.2d 313 (8th Cir.1992) (rejecting the argument that prisoners have a right to "any particular means of access"); *see also Williams v. ICC Comm.,* 812 F.Supp. 1029 (N.D.Cal.1992) (holding that the denial of legal telephone calls amounts to a constitutional violation only when prisoner has no access to lawyer by mail or through visits). The Court will dismiss these claims because plaintiffs do not allege that, in addition to being denied telephone calls, they were otherwise barred from communicating with their lawyers.

## F. *Religious Access Claims*

In 1993, Congress enacted the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–1 to 2000bb–4, which expanded, among other things, prisoners' free-exercise rights. *See* S.Rep. No. 103–111, at 9–10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899. The statute rejects the legal standard of *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), formerly applied to prisoner free-exercise claims. The *O'Lone* standard validated any prison regulations that might burden religious freedom so long as the regulations were reasonably related to legitimate penological interests. RFRA heightened this standard considerably, requiring that governmental actions substantially burdening free exercise satisfy a "compelling interest" test:

> Government may substantially burden a person's exercise of religion only if it demonstrates that the application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) it is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b).

Thus, the threshold question in analyzing a free-exercise claim under RFRA is whether the governmental actions at issue constitute a "substantial burden" on a plaintiff's religious practices. Courts that have considered the question have come to differing conclusions about the exact definition of a "substantial burden." Most have held that a substantial burden exists only when official action interferes with a religious practice that is mandated by or central to a plaintiff's religious beliefs. *See, e.g., Werner v. McCotter,* 49 F.3d 1476 (10th Cir.1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995). However, one district court has found that RFRA prohibits substantial burdens upon any religious practices, not only those deemed to be compulsory by religious doctrine; nonetheless this court requires that a plaintiff demonstrate that the burdened practice is motivated by a sincerely held religious belief. *See Muslim v. Frame,* 897 F.Supp. 215, 217–18 (E.D.Pa.1995) (Pollak, J.). Regardless of the test used, a defendant may still defeat a RFRA claim by demonstrating that the challenged actions further a compelling state interest in the least restrictive manner. *See Rust v. Clarke,* 883 F.Supp. 1293, 1305 (D.Neb.1995), *aff'd,* 89 F.3d 841 (8th Cir.1996).

The County defendants argue that they are entitled to qualified immunity from plaintiffs' RFRA claims because RFRA had not yet been enacted at the time of the complained-of events. *See, e.g.,* County Defendants' Brief re Archer at 15–17. Accordingly, these defendants contend that *O'Lone* sets the applicable standard and that their actions limiting plaintiffs' free exercise were reasonably related to legitimate penological interests. Plaintiffs respond that even if RFRA is found inapplicable, their claims should survive under the *O'Lone* standard.

The Court will not reach the question of the County defendants' qualified immunity because even under the RFRA standards no plaintiff has demonstrated a violation of his right to free exercise of his religion [4] Most plaintiffs have failed to present any facts to

---

4. The Court notes that the Supreme Court is now considering the constitutionality of RFRA in *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996). However, the result in *Flores* should not affect the outcome of the pres-

support their allegations that the County defendants substantially burdened their free exercise. Plaintiffs claim that the County defendants limited the number of inmates allowed to go to religious services at one time. Thus, each inmate did not get to attend services as often as he would have liked. *See, e.g.,* Custis and Stefano Religious Access Interrogs. ¶ 1; Frazier General Interrogs. ¶ 5(a). Plaintiffs do not, however, indicate what sincerely held religious beliefs were substantially burdened by this apportionment of available services to assure at least some access for all inmates. *See Muslim,* 897 F.Supp. at 217–18 (requiring that a prisoner claiming a violation of his free-exercise rights under RFRA demonstrate that a sincerely held religious belief has been substantially burdened). For example, plaintiffs do not assert that their beliefs entail attendance at any particular type of service with any particular frequency. Moreover, even if any plaintiffs had alleged such particulars, the fair apportionment of access to prison resources for the benefit of inmates of all faiths constitutes a compelling governmental interest, accomplished in the least restrictive manner, to defeat plaintiffs' RFRA claims. *See Rust v. Clarke,* 883 F.Supp. 1293 (D.Neb. 1995) (permitting prison officials to limit worship time, privileges, and religious items as least restrictive means of furthering compelling interest in fairly apportioning prison religious resources).

Two plaintiffs allege RFRA claims based on somewhat different facts. However, these two plaintiffs also fail to present valid claims. Plaintiff Long asserts that he was "refused 'Ramadan' where Muslims fast during daylight hours" and that there were "no Muslim services at CCCF." Long Religious Access Interrogs. ¶ 1. Plaintiff Hines states that he was deprived of Jumah, the Muslim Friday prayer service because he "was unable to congregate with all the other incarcerated members of his faith." Hines General Interrogs. ¶ 5(a). CCCF officials permitted Muslim inmates to gather on their own tiers for services rather than permitting all Muslims

throughout the jail to assemble. *Id.; see also* Barden and St. John Religious Access Interrogs. ¶ 1.

As to Long's allegations, his assertion that CCCF held "no Muslim services" is flatly contradicted by the statements of Hines, Barden, and St. John. His claim that he was "refused 'Ramadan' " is far too vague to survive a summary judgment motion. A plaintiff must make a threshold showing under RFRA that defendants have placed a substantial burden on his right to exercise his religion. *See Boomer v. Irvin,* 919 F.Supp. 122 (W.D.N.Y.1995). Long, by contrast, fails to provide, either initially in his answers to interrogatories or subsequently in his response to the County defendants' motion, any explanation of how he was prevented from abstaining from food during the daylight hours of Ramadan. The Court must thus grant the County defendants summary judgment on this claim. *See Crosley–El v. Berge,* 896 F.Supp. 885 (E.D.Wis.1995) (granting summary judgment for defendant where plaintiff presented no evidence to support bare conclusory statement that his Moorish religion prohibited attendance at general Muslim services).

In contrast to Long, Hines is somewhat more specific in contending that Jumah services should have included all CCCF inmates rather than being limited to inmates from individual tiers. *See* Hines General Interrogs. ¶ 5(a). Nonetheless, while Jumah may be "the central congregate service of the Muslim faith," *Boomer,* 919 F.Supp. at 124, Hines has not supported his contention that Muslims from a single tier would not be a sufficient group for worship. Moreover, even assuming that a prohibition against mass gatherings constituted a substantial burden, defendants have demonstrated a compelling governmental interest—the preservation of safety and security—in limiting the number of inmates who could gather at one time. *Cf. Shaheed v. Winston,* 885 F.Supp. 861 (E.D.Va.1995) (citing the need to maintain order in a crowded jail as justification for

ent cases because any finding that RFRA is unconstitutional would result in the application of the *O'Lone* standard to plaintiffs' free-exercise claims. Since the Court finds that plaintiffs fail

to present any valid claims under RFRA, *a fortiori,* they do not present any valid claims under the more lenient *O'Lone* standard.

limitations on services). Defendants have also demonstrated that they employed the least restrictive means to preserve prison safety and security.[5]

Thus, the Court will grant the County defendants summary judgment on all plaintiffs' free-exercise claims. In most instances, plaintiffs have failed to indicate that any specific actions of the County defendants created a substantial burden on their free-exercise rights. Even where a substantial burden may have existed, defendants' actions were the least restrictive means of assuring a compelling interest in safety and security at CCCF.

### III. CONCLUSION

Because plaintiffs fail to demonstrate substantial burdens on their religious practices, or, in some instances, because the County defendants had a compelling interest in maintaining security, and fulfilled this interest in a manner least restrictive of plaintiffs' religious rights, the Court will grant the County defendants' motion for summary judgment as to plaintiffs' free-exercise claims. Because plaintiffs fail to demonstrate actual injury arising from lack of access to a law library or legal materials, the Court will grant the County defendants' motion for summary judgment as to plaintiffs' access-to-courts claims as well. Because plaintiff Torres's complaint is barred by the applicable statute of limitations, the Court will also grant the County defendants' motion to dismiss his complaint in its entirety.

However, because the County defendants either had direct knowledge of the alleged constitutional violations or were responsible for policies that resulted in the alleged violations, and because there remain genuine issues of material fact as to the plaintiffs' conditions of confinement and medical care claims of general conditions of confinement

and claims of failure to provide medical care, the Court will deny the County defendants' motion to dismiss these remaining claims. An appropriate order will issue on even date herewith.

---

**5.** Hines's claim is distinguishable from that at issue in *Small v. Lehman,* 98 F.3d 762 (3d Cir. 1996). In *Small,* Sunni Muslim inmates challenged prison officials' failure to provide separate worship services. The Third Circuit held that summary judgment was not appropriate because there was a disputed issue of fact as to whether Sunni Muslims could permissibly worship in a combined service with other Muslims.

*See Id.* at 767–68. Insofar as the trial court in *Small* mistakenly had failed to apply RFRA, the Third Circuit did not reach the issue of whether defendants might have met the compelling-interest and least-restrictive-means tests. In contrast, Hines desires not a smaller group for worship but a much larger group. Hines's claim clearly implicates defendants' compelling interest in preserving order and security.