Carlito Caliph Maldonado
**GARCIA, Plaintiff,**

v.

**BOARD OF COUNTY COMMISSIONERS OF LEHIGH COUNTY, et al., Defendants.**

**Civil Action No. 01–6961.**

United States District Court,
E.D. Pennsylvania.

Aug. 14, 2003.

William J. Devlin, Jr., Devlin & Devine, Conshohocken, PA, Stephen M. Vannatten, City of Lehigh Dept. of Law, Department of Law, Allentown, PA, for Defendants.

## MEMORANDUM OPINION

RUFE, District Judge.

This prisoner's civil rights case comes before the Court on Defendants' Motion for Summary Judgment. For the reasons set forth below, Defendants' Motion is granted.

Plaintiff Carlito Caliph Maldonado Garcia ("Garcia") filed his Complaint in this civil rights action on February 2, 2002. At that time, he was a prisoner incarcerated at Lehigh County Prison ("LCP"), although he has since been released from prison. In his *pro se* Complaint, Garcia alleges that prison officials infringed on the free exercise of his religion by separating the prison's weekly Islamic religious service, or "Jummah,"[1] into two separate groups. This action, he contends, "abrogrates shariah law and the most basic and fundamental rights of Islam." [sic] Complaint at V. Defendants claim that such action was justified by security and safety concerns.

Plaintiff pursues a claim under 42 U.S.C. § 1983, and seeks injunctive and monetary relief. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343.

Today's decision was preceded by some irregularity in the motions practice. When Defendants filed their Motion for Summary Judgment, Plaintiff responded by filing his own Motion for Summary Judgment. Nonetheless, a review of this latter document leads the Court to believe that it is actually a response to Defendants' Motion (hereinafter "Plaintiff's Response").[2]

The only evidence submitted with Plaintiff's Response was a diagram of his prison "pod," and several prison grievance forms, some of which appear to be part of Plaintiff's efforts to resolve this dispute via internal prison procedures. However, Plaintiff's Response also included an alle-

---

1. This spelling is taken from the pleadings and documents in the record, although it is also described there as "Ummah." The Court will use "Jummah" for the sake of clarity and consistency.

2. Interestingly, the bulk of Plaintiff's pleading appears to be his service copy of Defendants' motion, altered with white-out and handwritten amendments.

gation that was not previously in the case, *i.e.*, that Defendants had prohibited the Islamic community from worshipping in a single congregation, while not imposing the same restriction on other religious groups. While it is clear that allegations appearing in Plaintiff's legal memorandum are not evidence and cannot themselves create a factual dispute sufficient to defeat a summary judgment motion, *see Jersey Cent. Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1109–10 (3d Cir. 1985), the Court considered it in exercising its duty to be solicitous toward *pro se* litigants. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Smith v. Mensinger,* 293 F.3d 641, 647 (3d Cir.2002).

Concerned that Plaintiff's allegation presented a question as to whether Defendants had created unequal opportunities to practice religion contrary to *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), on July 23, 2003, the Court directed Defendants to address this allegation in a memorandum of law. Defendants responded to this directive on July 28, 2003 by moving to strike Plaintiff's Response, explaining that Defendants never received a service copy. On July 29, 2003, the Court denied the motion, directed the Clerk of Court to mail a copy of Plaintiff's Response to Defendants, and extended the deadline for filing the requested memorandum. On August 4, 2003, apparently in response to the July 23, 2003 Order, Plaintiff sent a document directly to this judge's chambers, which the Court ordered filed on the case docket. In an abundance of caution, the Court provided a copy of this document to Defendants via facsimile the same day. Finally, Defendants filed a timely "Sur–Reply Brief," and Defendants' Motion is now ripe for review.

### SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial responsibility for informing the Court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. It is not required to produce any evidentiary materials to negate the opposing party's claim. *Id.* The burden then shifts to the nonmoving party to designate, through the use of affidavits and other evidentiary materials, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; Fed. R.Civ.P. 56(e) (party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading"). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### DISCUSSION

■ Plaintiff challenges the constitutionality of the prison's policy of separating Muslim prisoner prayer services into two separate groups. Plaintiff bears the burden of demonstrating that the prison's policy is invalid. *Overton v. Bazzetta,* —— U.S. ——, ——, 123 S.Ct. 2162, 2168, 156 L.Ed.2d 162, —— (2003). Defendants argue that Plaintiff cannot meet this burden.

■ The Supreme Court in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) held that a prison regulation that impinges on inmates' constitutional rights is valid if it is reasonably related to legitimate penological interests.

The Third Circuit has since summarized the test accordingly:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*DeHart v. Horn,* 227 F.3d 47, 51 (3d Cir. 2000) (en banc) (quoting *Waterman v. Farmer,* 183 F.3d 208, 213 (3d Cir.1999)) (internal quotations omitted); *see also Overton,* 123 S.Ct. at 2168. Defendants contend that application of the *Turner* test demonstrates that LCP's policy is constitutional.[3]

**A. Whether the Lehigh County Prison Regulation is Reasonably Related to a Legitimate Penological Interest**

█ Under this first prong, the Court must "accord great deference to the judgments of prison officials 'charged with the formidable task of running a prison.'" *Sutton v. Rasheed,* 323 F.3d 236, 253 (3d Cir.2003) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 96

L.Ed.2d 282 (1987)). The prison contends that it initiated its regulation requiring division of Muslim services out of a legitimate concern for the safety and security of prison officials and inmates. Mr. Edward Sweeney, Director of Corrections for the Lehigh County Department of Corrections, explains the basis for imposing the regulation in two affidavits submitted to the Court.

LCP houses individuals who are sentenced to serve time under court order, or as pre-trial detainees. All LCP prisoners are initially classified pursuant to a "classification tree," and assigned to an appropriate unit. The purpose of the unit classifications is to segregate prisoners based on many risk factors, including but not limited to potential inmate on inmate violence, gang affiliation and other behavioral problems, all of which could pose a threat to prison officials and/or inmates. Plaintiff was incarcerated on September 11, 2001 for a violation of his county parole supervision and for new felony charges of aggravated assault, simple assault and resisting arrest. Based on his felony assault charges and past known institutional behavior, prison officials classified him as a maximum security risk, and housed him in one of two units for violent offenders. These units are located on the second (unit 2–C) and third (unit 3–D) floors of the prison.

The prison allows inmates to gather for religious or non-religious programs or activities, subject to some restrictions. First, such gatherings must be supervised by a staff member or an approved community volunteer.[4] Second, the design of the

---

**3.** The *Turner* analysis is appropriate only where a prisoner establishes that the prison policy impinges on a constitutional right. *DeHart,* 227 F.3d at 51. Defendants argue that Plaintiff cannot make this showing. However, because the Court concludes that Plaintiff's claim fails under *Turner,* the Court assumes for purposes of today's decision that

LCP's policy does in fact impinge on Plaintiff's First Amendment right to free exercise of religion.

**4.** Defendants also explain that sometime prior to Plaintiff's incarceration in September 2001, the prison began experiencing difficulty in successfully recruiting community volun-

prison facility requires that the prison limit the number of inmates that may gather in designated meeting rooms. One such room is the "multipurpose room," located on the third floor between prison pods 3–A (housing non-violent inmates) and 3–D (housing violent inmates). The prison permits no more than twenty inmates, and no more than ten inmates from each housing unit, to gather in the multipurpose room. Two correctional officers can view the inmates in the multipurpose room during any activity period. Religious gatherings might also take place in one of six "activity rooms." These rooms can hold up to thirty people. However, unlike the multipurpose room, the activity rooms are not designed to have correctional officers supervise the inmates during activities there.

Finally, in addition to these supervision and space restrictions, LCP prison officials restrict gatherings based on more specific security threats that may arise from the dynamic existing between particular prisoners. As noted above, certain violent inmates may be placed in separate housing units because they hold grudges against each other, or are "enemies," and thus pose a threat to each other, fellow prisoners, and prison staff. Consistent with this policy, prison officials attempt to separate these inmates from each other during activities. One way this is accomplished is by compiling a list of prisoners who wish to attend a particular gathering in an activity room, and reviewing this list to ensure no undesirable mingling occurs.

■ These restrictions apply to all activities at the prison, including all religious

activities, regardless of religious denomination. The circumstances of this case arose as a result of these restrictions. Five months prior to Plaintiff's incarceration in September 2001, the number of LCP inmates attending Muslim religious services and other group religious services had significantly increased. In light of the space and security concerns discussed above, Muslim service participants were split into two separate groupings based on their housing unit assignments, and it became impossible for all Muslim service participants to worship together in a single group. Plaintiff offers no evidence to contradict these facts, and his generalized attacks on the motives of prison officials are not relevant here. *See* Fed.R.Civ.P. 56(e) (the party resisting summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial).

The only related "facts" offered by Plaintiff are his unsupported assertions that Defendants prohibited the Islamic faith community from worshipping in a single congregation, while not imposing the same restrictions on other religious groups.[5] However, taking this allegation in the light most favorable to Plaintiff, this still does not create a material issue of fact as to whether the prison's policy is reasonably related to a legitimate penological interest.

Even assuming Islamic services are the only religious gathering impacted by the prison policies discussed above, this does not contradict the explanation provided by the prison: that *neutral* factors such as

5. As noted above, Plaintiff's unsupported allegations are not evidence, but the Court will assume they are supported for purposes of analysis. *See* discussion *supra* at 407; *Jersey Cent. Power & Light,* 772 F.2d at 1109–10.

the number of inmates that wish to attend Islamic services, and/or the security concerns posed by certain individuals, require that the prison arrange for two, separate Islamic services. The fact that this same consequence does not arise in gatherings for other religious groups gives rise to the inference that this is because the same factors are absent, not because the prison applies its policy arbitrarily based on religious denomination. Plaintiff has presented no evidence that might give rise to this latter inference, and in fact his evidence is consistent with the innocent inference flowing from Defendants' proffered explanation.[6]

It is beyond question that safety and security of prison staff and inmates is a legitimate penological interest. *Overton*, 123 S.Ct. at 2168 ("The regulations promote internal security, perhaps the most legitimate of penological goals."); *Thornburgh v. Abbott*, 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) ("protecting prison security ... is central to all other correctional goals") (internal quotes and citation omitted). The Court is satisfied that the measures imposed by LCP are reasonably related to its legitimate penological interest in maintaining appropriate security. If in the judgment of prison officials the mingling of certain individuals may give rise to violence or some other threat to the safety of inmates and prison officials, restricting such individuals' access to each other is an eminently reasonable precaution. It is also reasonable to limit the number of inmates gathering in a room based on the size of the room and the ability of prison staff or volunteers to supervise the gathering. Accordingly, this first factor weighs heavily in favor of Defendants.

## B. Whether Plaintiff Retains Alternative Means of Exercising the Circumscribed Right

■ This factor requires a court to "focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity." *De-Hart*, 227 F.3d at 53. "[W]here 'other avenues' remain available for the exercise of the asserted right ... courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulations.'" *Id.* (quoting *Turner*, 482 U.S. at 90, 107 S.Ct. 2254). The relevant inquiry is "whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *Id.* at 55.

■ As the Third Circuit has recognized, communal worship may be a fundamental aspect of the exercise of religion. *See Small v. Lehman*, 98 F.3d 762, 767 (3d Cir.1996) ("an opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience and, therefore, a fundamental exercise of religion by a bona fide religious group"), *abrogated on other grounds by City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Plaintiff does not contend that LCP restricts him from worshiping in a group setting, or that LCP otherwise restricts him from practicing his faith.[7] Rather, he objects

---

6. Upon review of the explanation provided by the prison at the Court's request, the Court is also satisfied that the prison's policy does not create unequal opportunities for religious activity. *See Beto*, 405 U.S. at 322, 92 S.Ct. 1079.

7. One of the grievance forms attached to Plaintiff's motion for summary judgment al-

leges that a female correctional officer entered Plaintiff's cell and purposefully disrupted his prayers by pushing him on the shoulder. There is no other evidence that LCP staff ever purposefully interfered with Plaintiff's religious practice. Although this incident, if true, is an example of insensitive conduct on the part of prison staff, no reasonable juror could conclude on the basis of

because his worship group does not consist of LCP's entire "religouse [sic] community of Islam." *See* Complaint at V. Although security and space concerns apparently preclude permitting LCP's entire Islamic population from worshipping in a single group, the Court is satisfied that Plaintiff has an alternative means of exercising his religion alone and with other members of his faith. Thus, this factor weighs heavily in favor of Defendants. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (finding prisoners who could not attend Jummah had alternative means of expressing Muslim faith generally by observing other religious prayer and dietary obligations); *cf. Ingalls v. Florio,* 968 F.Supp. 193, 205 (D.N.J.1997) (finding plaintiff failed to support his contention that Muslims from his prison tier, as opposed to all Muslims in the entire prison, is a sufficient group for worship).

### C. Remaining Factors

The third and fourth factors require that the Court focus on "the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources." *De-Hart,* 227 F.3d at 57. Here, the practice at issue is congregational worship, and stems from Plaintiff's belief that it is a violation of Islamic law to separate the Jummah into two separate groups. In other words, he contends that it impinges on the practice of his religion to worship in a group that is only a fraction of LCP's Muslim religious community.

■ As already set forth above, the Director of Corrections explained in his affidavit that assemblage of large numbers of inmates from varied housing units during prison activities may present security risks to inmates and prison officials because it would result in, among other things, mixing of violent rival gang members. As an indirect consequence of this policy, the entire Muslim community cannot worship in a single group. Although Defendants make a logical argument that such increased security risks would give rise to increased financial burdens caused by the need for more guards and other security measures, there is no evidence in the record to support this claim. In any event, Plaintiff offers no contrary evidence, and thus this factor weighs heavily in favor of Defendants.

### CONCLUSION

■ As set forth above, all of the *Turner* factors weigh in favor of Defendants, and there are no genuine disputes of material fact. The Court does not hesitate to conclude that the prison's actions were reasonably related to legitimate penological interests, and that Defendants have not violated Plaintiff's constitutional rights. Accordingly, Defendants' motion for summary judgment is granted. An appropriate Order follows.

### ORDER

**AND NOW,** this 14th day of August, 2003, upon consideration of Defendants' Motion for Summary Judgment [Doc. # 32], and Plaintiff's Motion for Summary Judgment [Doc. # 33], Plaintiff's Response

this single incident that LCP was unconstitutionally restricting Plaintiff's right to free exercise of his faith. In any event, Plaintiff's Complaint is grounded in the division of Muslim prayer groups, and not any other alleged conduct. Therefore, the grievance form does not give rise to a genuine issue of material fact that might preclude summary judgment. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (to avoid summary judgment evidence must be such that a reasonable jury could return a verdict for the nonmoving party).

to certain issues [Doc. # 38], Defendants' Sur–Reply [Doc. # 39], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that:

1. Defendants' Motion is **GRANTED;**

2. Plaintiff's Motion is **DENIED;**

3. Judgment is hereby **ENTERED** in favor of Defendants and against Plaintiff;

4. The Clerk of Court is directed to mark this case closed for statistical purposes.

It is so **ORDERED.**