

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-19-2003

# Sutton v. Rasheed

Precedential or Non-Precedential: Precedential

Docket 97-7096

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Sutton v. Rasheed" (2003). *2003 Decisions.* Paper 680.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/680

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 19, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7096

RICHARD X. SUTTON;
ROBERT X. WISE; MICHAEL X. WALKER,
Appellants

v.

IMAM ADEEB RASHEED;
JAMES SMITH, Chaplain; FRANCIS MENEI, Chaplain;
JOHN PALAKOVICH; KENNETH KYLER;
MARTIN F. HORN;

UNITED STATES OF AMERICA
(Intervenor in District Court)

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. Civil Action No. 94-cv-01865
(Honorable Edwin M. Kosik)

Argued: March 6, 2002

Before: BECKER, *Chief Judge* and SCIRICA, *Circuit Judge*,
and POLLAK, *District Judge*\*

(Filed March 19, 2003)

---

\* The Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

JEFFREY S. ISTVAN, ESQUIRE
 (ARGUED)
Fine, Kaplan & Black
1845 Walnut Street, 23rd Floor
Philadelphia, Pennsylvania 19103
  Attorneys for Appellants

FRANCIS R. FILIPI, ESQUIRE
 (ARGUED)
Office of Attorney General of
 Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, Pennsylvania 17120
  Attorney for Appellees

WILLIAM E. FAIRALL, JR., ESQUIRE
Department of Corrections
55 Utley Drive
Camp Hill, Pennsylvania 17011
  Attorney for Amicus-Appellee,
  Pennsylvania Department of
  Corrections

---

## OPINION OF THE COURT

---

*PER CURIAM*:

   This is an appeal from an order of the District Court granting defendants summary judgment on claims that defendants infringed upon, *inter alia,* plaintiffs' rights protected by the Free Exercise Clause of the First Amendment. Plaintiffs, three members of the Nation of Islam,[1] contend that the Pennsylvania Department of Corrections' former policy of limiting inmates' access to religious material while they were confined in a special unit for high-risk inmates was unconstitutional — both as applied and facially — because defendants used "unlawful prison rules" to "illegally ban" Nation of Islam texts.

---

1. The Nation of Islam movement is "based on the [Qur'an] as interpreted by Elijah Muhammad and ministers within the Nation." *Cooper v. Tard*, 855 F.2d 125, 126 (3d Cir. 1988).

We hold that there was a constitutional violation, but because we conclude that defendants are protected by qualified immunity, we will affirm.[2]

## I.

In response to three days of riots in 1989 by prisoners at the State Correctional Institute at Camp Hill ("SCI-Camp Hill"), the Pennsylvania Department of Corrections designed, and in April 1992 created, a Special Management Unit ("SMU") at SCI-Camp Hill. Prior to the establishment of the SCI-Camp Hill SMU, high-risk inmates of Pennsylvania prisons were placed in restricted housing units ("RHUs"), maximum custody settings still used at a number of correctional institutions other than Camp Hill.[3] A salient aspect of the RHU regime, as it existed at the commencement of this litigation, was its limitation on what reading materials an RHU inmate could keep with him. Department of Corrections Administrative Directive 802 ("DC-ADM 802") provided that inmates in administrative custody were permitted "no books other than legal materials and a personal Bible, Holy Koran[4] or other religious equivalent . . . ."[5] Department of Corrections Administrative Directive 801 ("DC-ADM 801") similarly provided: "[administrative custody] inmates will be permitted legal material that may be contained in one (1) records center box . . . . A personal Bible, a Holy Koran, or equivalent publication is permitted."

---

2. We have jurisdiction under 28 U.S.C. § 1291.

3. According to Department of Corrections Regional Deputy Commissioner Dr. Jeffrey Beard, "[T]he RHUs are used for both disciplinary and administrative custody inmates, to provide secure housing for both inmates who require long-term confinement in maximum housing because of an inability to adjust to prison life in general population as well as for those who need such custody only in the short term to address a misconduct or temporary security need."

4. "Koran" is an alternate spelling of "Qur'an."

5. DC-ADM 802, section V provided authority for a "Program Review Committee" or "Unit Management Team" to add privileges "based on an individual's need, on safety and security, and on behavioral progress of the inmate."

The regulations governing the SCI-Camp Hill SMU were modeled on those governing the RHU.[6] But unlike the Department of Corrections' traditional restricted housing units, the SMU is a structured program that provides for progression through a series of five phases, from Phase V to Phase I, at which point the inmate is returned to the general prison population.[7] Progression from one phase to the next is accomplished by compliance with specified goals and is rewarded by additional privileges. The intent of the program is to provide security for both staff and inmates while at the same time giving inmates with a long history of behavioral problems various incentives to modify their behavior. The program functions to prepare such inmates for reintegration into the general prison population.

Some inmates begin their time in the SMU at Phase IV, but most begin at Phase V. Inmates in Phases III, IV, and V are under restrictive regimes: they are placed under strict security and control practices; they have short exercise periods; and they have limited access to their own personal property. At the outset of this litigation, a Phase V SMU inmate's access to personal property was confined to a newspaper, one package of cigarettes every two weeks, one records center box of legal materials ("with even exchange"),[8] and religious materials consisting of one personal "Bible, Quran or equivalent only."[9] Phase IV increased inmates' privileges slightly, but still allowed them a "Bible, Quran, or equivalent only." At Phase III, an inmate was allowed to have legal materials, a Bible or Qur'an, and "[two] other religious reading materials." At Phase II, an inmate was

6. The Department of Corrections' summary of those regulations, Appendix III to the SMU Inmate Handbook, is reprinted as an appendix to this opinion.

7. In a June 29, 1992 Department of Corrections policy statement, the SMU is defined as "A special unit within designated Department of Corrections institutions designated to safely and humanely handle inmates whose behavior presents a serious threat to the safety and security of the facility, staff, other inmates, or him or herself."

8. According to the appellees, "[a] records center box has approximate interior dimensions of 15 inches (long) by 12 inches (wide) by 10 inches (deep)."

9. "Quran" is another alternate spelling of "Qur'an."

permitted legal materials, a Bible or Qur'an, and four other religious reading materials. At Phase I, an inmate was returned to the general population, with all privileges "except that [his] movements [would] be controlled and monitored."

Plaintiff Richard X. Sutton was confined in the SMU from October 5, 1993 until July 20, 1995, when he was transferred to SCI-Greene. Plaintiff Robert X. Wise was confined in the SMU from January 3, 1994 until December 27, 1994, when he was transferred to SCI-Graterford; as of August 28, 2000, he was in the general population at SCI-Albion. Plaintiff Michael X. Walker was confined in the SMU from November 17, 1993 until August 28, 1996, when he was transferred to SCI-Rockview. Plaintiff Walker has now been released from prison. All three are adherents of the Nation of Islam.

Several times between October 1993 and May 1994, Sutton asked defendant Imam Adeeb Rasheed,[10] the Muslim Chaplain at SCI-Camp Hill, whether he would be permitted to have access to various texts written by Fard Muhammad, Elijah Muhammad and Louis Farrakhan from his personal property.[11] Believing the texts were not religious, Imam Rasheed determined that Sutton should not be permitted access to them. During the same period, Sutton also asked Officer Olenowski, the SMU Property

10. The caption of this case spells the Imam's name as "Rashid." In deposition testimony, the Imam stated that the proper spelling of his surname is "R-A-S-H-E-E-D." This opinion will use the latter spelling.

11. Fard Muhammad was the founder of the Nation of Islam, and followers believe him to have been the Messiah. Elijah Muhammad is believed by Nation of Islam faithful to have been a prophet. Louis Farrakhan is a prominent minister in one of the branches of the Nation of Islam. The texts in question are primarily those written by Elijah Muhammad: *Message to the Blackman*, *The Supreme Wisdom*, *How to Eat to Live*, *Our Savior Has Arrived* and *The Fall of America*. In addition, plaintiff Wise attempted to obtain *The Meaning of FOI* by Louis Farrakhan and *The Wake of the Nation of Islam* by Silas Muhammad. In her deposition, plaintiffs' expert, Aminah Beverly McCloud, a professor of Islamic Studies in the Department of Religious Studies at DePaul University, states that the texts in question are "required reading by the faithful." Her report is unrebutted.

Officer, for the books in question. The inmates' personal property, which includes the Nation of Islam texts at issue, appears to have been stored in the SMU Property Room. Olenowski, in turn, asked Imam Rasheed whether the books were religious. Imam Rasheed responded negatively, and Olenowski denied Sutton access to them. By May 27, 1994, Sutton reached Phase III of the program, and, under the regulations, was permitted two religious texts in addition to the Qur'an. He requested two Nation of Islam texts from his personal property. But Acting Property Officer Stone denied the request because "[n]o religious books [were] found that were authorized by the Imam [i.e., Rasheed]."

On May 30, 1994, Sutton filed an Official Grievance directed to defendant John A. Palakovich, the Superintendent's Assistant at SCI-Camp Hill from 1979 until July 1995. Palakovich forwarded the grievance to defendant Reverend James W. Smith, the Facility Chaplaincy Program Director at SCI-Camp Hill. In addition, Sutton sought the assistance of defendant Kenneth D. Kyler, the Superintendent of SCI-Camp Hill. In an attempt to resolve the impasse, the SMU Unit manager, Arthur Auxer, together with Reverend Smith and Imam Rasheed, met with Sutton. That meeting appears to have been contentious. Sutton expressed his belief that *Message to the Blackman*, one of the principal works of Elijah Muhammad, was religious and that Rasheed was "not an Imam" — presumably meaning that he was not a Nation of Islam Imam. Imam Rasheed and Reverend Smith insisted that *Message to the Blackman* was not an Islamic text. The meeting ended without resolution.

On June 9, 1994, Sutton filed a second grievance with Palakovich, the Superintendent's Assistant, stating he did "not believe in the same doctrine as Rasheed." On June 14, Palakovich again denied Sutton's request for the books because "[t]he books in question were received by Chaplain Rasheed and determined not to be religious in nature." The same day, Superintendent Kyler denied the appeal that Sutton had initially filed, writing that "[s]ince the books in question are not considered religious books, you may not receive them at this time." Kyler also wrote, "It should be

pointed out that Chaplain Rasheed as the Muslim Ima[m] is considered the authority when making a determination on this type of book." When Sutton again wrote to Kyler asking for the basis of Imam Rasheed's authority, Kyler responded that "Rev. Rasheed is an Islamic Minister and as such is the recognized institution authority on the Muslim religion."

On July 4, 1994, Sutton wrote to defendant Father Francis T. Menei, Administrator of Religious and Family Services at the Department of Corrections, explaining that Imam Rasheed, as a Sunni Muslim, did not follow the teachings of Elijah Muhammad. He again requested access to his Nation of Islam texts. Father Menei asked Reverend Smith to review the books. In a memorandum to Father Menei, Reverend Smith wrote:

> On July 26, 1994 I reviewed the following books written by Elijah Muhammad:
>
> > Our Savior Has Arrived"
> > "Message to the Blackman"
> > "How to Eat to Live"
>
> The general contents of each of the aforementioned books appears to be of a social/political nature, referencing both racial superiority and political activism. Religious discussion is generally in the context of a social agenda, making "religion" a vehicle for the promotion of the central ideologies in these books, the essence of which smacks of racism and hatred.
>
> Religion, by definition, begins and ends with a search for and discovery of God.
>
> These books are about attaining a political program, "religion" merely attached to their itinerary as a useful component to achieving this end.
>
> It is therefore my opinion that these books are not essentially religious in nature.

Two days later, without reviewing the books in question, Father Menei wrote to Sutton regarding his appeal, stating, "We have determined that these books are *not* essentially religious in nature," and that "these books smack of racism

and hatred, and I know of no God that wants us to worship him in this way."

Plaintiff Robert X. Wise appears to have gone through a similar peregrination. At some point prior to June 6, 1994, Wise attempted to gain access to various Nation of Islam texts kept in the property lock-up. Wise was not allowed to have any of his Nation of Islam books because he was at Phase IV of the SMU program, which only permitted access to a Bible, Qur'an or "equivalent religious text." On June 6, Wise filed a grievance with Palakovich, explaining that he was a member of the Nation of Islam and that he had been denied access to the texts, and questioning the authority of Imam Rasheed to determine whether Nation of Islam texts were religious. Reverend Smith responded to that grievance, noting that Imam Rasheed had determined the material in question was not religious and that an inmate at Phase IV was only permitted access to "his main holy book." Wise appealed to Superintendent Kyler, arguing he did not "worship the same God that Orthodox Imam Rasheed worships." Kyler denied that appeal, writing, "The Muslim Chaplain is the religious authority in determining if the books are religious or not." He concluded, "Since [Rasheed] has determined it not to be religious, you are not permitted to have it while in the SMU." Kyler also wrote, "I would suggest you concentrate on improving your adjustment to be released from the SMU at which time you may have the book in question."

At some point before July 12, 1994, Wise reached Phase III in the SMU system, and again sought access to the Nation of Islam texts. His requests were denied on the ground that Imam Rasheed determined the texts were not religious. On July 15, 1994, Wise filed a grievance with Palakovich, who denied the request for the texts because Reverend Smith determined the books in question were not religious and not permitted in the SMU.

Between November 1993 and the fall of 1995, SMU inmate Michael X. Walker also requested various Nation of Islam tracts by Elijah Muhammad and Louis Farrakhan. His requests were denied.

## II.

Plaintiffs Sutton and Wise filed a *pro se* complaint in November of 1994 against defendants Imam Rasheed, Reverend Smith, and Father Menei. After retaining counsel in the summer of 1995, Sutton and Wise, together with plaintiff Walker, filed an amended complaint, adding defendants Kyler and Palakovich and Commissioner of Corrections Martin F. Horn. As the District Court compendiously summarized, the principal claims put forward in the amended complaint were that defendants' "alleged deprivations of [plaintiffs'] religious materials . . . violated [plaintiffs'] rights to: free exercise of religion under the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-bb-4 (1993) (the 'RFRA'); freedom from the establishment of religion by the state under the First Amendment; due process and equal protection under the Fourteenth Amendment; and the rights secured by 42 U.S.C. §§ 1981, 1985(3), and 1986."[12] *Sutton v. Rashid*,[13] No. 97-7096, unpub. op. at 2 (M.D. Pa. Sept. 3, 1996). The amended complaint sought "[c]ompensatory and punitive damages, as well as declaratory and injunctive relief and attorneys' fees." *Id.* On September 3, 1996, the District Court granted defendants' motion for summary judgment as to plaintiffs' free exercise claims and denied plaintiffs' motion for partial summary judgment. On January 21, 1997, the District Court granted defendants' supplemental motion for summary judgment on the remaining claims. Plaintiffs filed a timely appeal. In a judgment order dated November 21, 1997, we affirmed the judgment of the District Court. Plaintiff-appellants subsequently filed a petition for panel rehearing, which was granted.

On October 29, 1998, at oral argument before this court, counsel for defendants argued that the policy under attack had been changed, effective August 16, 1995. In making

---

12. Plaintiffs' contentions based upon RFRA have been rendered moot by the decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997) (as applied to the states and hence to state officials, RFRA exceeds congressional power).

13. As noted, this caption misspells Rasheed.

this argument, counsel relied on two administrative directives that allegedly amended DC-ADM 801 and 802 "to allow inmates to maintain religious, as well as legal material, in one (1) records center box"; and the declaration of Dr. Jeffrey Beard, explaining the reasons for those amendments. Counsel further represented that the Nation of Islam texts in question are now "absolutely" permitted. In response to these representations, plaintiffs filed, on December 28, 1998, a "Motion to Supplement the Record on Appeal." Because the proposed additional information was keyed to the question of mootness, we granted plaintiffs' motion and directed defendants to file a memorandum addressing the record as supplemented. *See Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992) (en banc) ("[B]ecause mootness is a jurisdictional issue, we may receive facts relevant to that issue; otherwise there would be no way to find out if an appeal has become moot.").

The enlargements to the record include an affidavit from Sutton and two institutional grievance forms. Together, these documents suggest that Sutton, while assigned to the Houtzdale RHU in December of 1998, requested, from his personal property, the following texts: *The Flag of Islam* (by Elijah Muhammad), *Seven Speeches* (by Louis Farrakhan), *A Torchlight for America* (by Louis Farrakhan), *The Convention of the Oppressed* (by Louis Farrakhan), *How to Teach Math to Black Students* (by Shahid Muhammad), *Light from the Ancient African* (author unknown), *Creating Wealth* (by Robert G. Allen), *Black Economics* (by Jawanza Kunjufu), *My Life's Journey Traveling with the Wise Man* (by Mother Tynnetta Muhammad[14]), *The Corner by Night* (by Mother Tynnetta Muhammad), and *This Is the One* (by Jabril Muhammad). According to his affidavit, Sutton was denied access to these texts on the basis of regulation DC-ADM 801, which limited inmates in the RHU to a Bible, Qur'an, or equivalent religious text, despite Sutton's attempt to convince the officer involved that the cited policy was no longer in effect. In the Department of Corrections' responsive papers, Superintendent John McCullough stated:

---

14. Mother Tynnetta Muhammad was the wife of Elijah Muhammad.

> I am aware that an inmate currently at my institution, Richard X. Sutton . . . has submitted an affidavit in which he represents that the amendments to [DC-ADM] 801 and 802 effective August 16, 1995 are either not in effect or not being faithfully followed.

> That is not correct. To the contrary, the bulletins that were issued and made effective from August 16, 1995 . . . have been in full force and in effect the entire time SCI-Houtzdale has been open to confine inmates.

> . . . .

> I appreciate that Mr. Sutton's December 3, 1998 grievance . . . would lead the casual reader to the conclusion that Mr. Sutton was denied the additional books because he was limited by the former policy to one Bible, Holy Koran or its religious equivalent. This is simply incorrect. The issue being addressed through Mr. Sutton's grievance (although this is not clear either from his grievance or from the response he ultimately received) was whether the two books written by Mother Tynnetta Muhammad were religious books (which would have been permitted so long as they could be contained with Mr. Sutton's other legal and religious material in a records center box) or were educational books (which the inmate is not permitted to possess in the status that Mr. Sutton was then in).

On April 19, 1999, appellants filed a Second Motion to Supplement the Record on Appeal, containing an affidavit from Wise, stating that the prior policy remained in effect at SCI-Albion, where he was confined. Concluding that the record on appeal had been sufficiently augmented, we denied that motion.

On July 12, 1999, we entered an order directing the parties to "file succinct memoranda reflecting relevant changes in policy, law or additional submissions." In light of these submissions, we remanded the case on September 20, 1999 (while retaining jurisdiction) to the District Court with "instructions to determine whether the claim for injunctive and declaratory relief is moot in view of the putative change in policy." We stated that "[i]n making this determination, the Court may wish . . . . to ascertain how

Corrections officials determine whether a book requested by a prisoner qualifies as religious material under the current policy, and whether the [Nation of Islam books requested] are available to inmates as religious materials . . . ."

Accordingly, the District Court held a hearing on January 27, 2000, on the most recent incarnation of the Department of Corrections policy and its implementation. In a subsequent Order, the District Court found the August 16, 1995 changes to the Department of Corrections policy were poorly enforced. The District Court also found that even after state correctional facility superintendents were informed of policy misinterpretations on April 28, 1999, "distinctions and limitations persisted . . . . Although an administrative procedure was in place where disputes arose, the prison authorities continued to follow previous practices in determining what was religious material. This practice continues." The District Court also referenced a Department of Corrections policy change made in February 2000 and observed that the new policy failed to define religious materials, an issue "which continues to be at the root of continuing misinterpretations."

After the District Court's memorandum, the putative February 2000 SMU policy change became effective April 17, 2000.[15] Because the effects of this latest policy change had not yet been determined, we again remanded on June 16, 2000 to the District Court "with directions to determine whether plaintiffs' claims for injunctive and declaratory relief are moot."

On remand, the District Court entered an order on August 21, 2000, advising that plaintiffs' claims for injunctive and declaratory relief were not moot. But in a Supplemental Memorandum dated October 30, 2000, the District Court stated the injunctive and declaratory relief

---

15. The February 2000 policy change (targeted to go into effect on March 15, 2000) provides that "[disciplinary custody] inmates will be permitted to retain religious, as well as legal materials that may be contained in one record center box. Any additional or religious materials will be stored and made available upon request on an even exchange basis. Not more than one subject for every day unless approved by the Department of Corrections."

claims were moot.[16] To resolve this confusion, we remanded again with instructions to "fully comply" with our June 16, 2000 Order.[17] We also granted motions to file supplemental briefs on mootness and granted leave to supplement the record on appeal. On March 21, 2001, we reaffirmed our prior remand requesting the District Court to issue a final order on mootness and to make a determination whether this was an injury capable of repetition yet evading review. We also requested the District Court to make findings of fact and determine whether plaintiffs still pressed damage claims.

After this remand, the District Court held that the claims for injunctive and declaratory relief were moot. The District Court based this holding on submissions from the Department of Corrections about a new SMU directive adopted October 5, 2001[18] that "virtually allow[s] each inmate to determine what is religious material." The District Court observed "because we concluded that the changes to Directives 801 and 802 have force of law, we do not believe that the injury was of a type likely to happen to plaintiff again regardless of declaratory and injunctive relief." The District Court also stated that damages claims remained pending.

The October 5, 2001 amendment of DC-ADM 801 provides:

16. In the Supplemental Memorandum, the District Court found: (1) the specific books plaintiffs sought have been provided to them; (2) it is undisputed that the policy change of February 2000, which became effective on April 17, 2000, was issued throughout the Pennsylvania Department of Corrections facilities; (3) employees were not provided with a definition of religious material in the policy change; (4) an inmate may have as much combined legal or religious material as will fit inside one records center box; and (5) an inmate aggrieved by a decision on what is "religious material" may file a grievance challenge. The District Court also stated "the broader issue of what is defined as 'religious' material in the present case remains constitutionally questionable."

17. Just prior to this Order, the District Court submitted the Supplemental Memorandum clarifying his previous memorandum.

18. The District Court was advised by the Office of the Attorney General for Pennsylvania that another policy was "formally adopted on October 5, 2001, and is contained in Administrative Directives 801 and 802."

    5. [Disciplinary Custody] status inmates shall be permitted to maintain in their cells any combination of personal property from the following list that will fit into one standard sized records-center box:

    a. Written materials in accordance with DC-ADM 803, "Inmate Mail and Incoming Publications";[19]

    b. One newspaper (one-for-one exchanges are permitted for newly received editions);

    c. Ten magazines (one-for-one exchanges are permitted for newly received publications).

Additionally, each facility will establish procedures to permit inmates to exchange legal materials from their cells with stored legal materials once every 30 days.[20] The Program Review Committee may authorize more frequent exchanges based upon a demonstrated need that the inmate requires additional exchanges for active litigation. Such legal material exchanges, however, may not exceed one per week.

DC-ADM 801-3, "Disciplinary Custody Status Inmates," amending section IV, M.

    The October 5, 2001 amendment to DC-ADM 802 provides:

    4. [Administrative Custody] status inmates shall be permitted to maintain in their cells any combination of personal property from the following list that will fit into one standard-sized, records-center box:

    a. Written materials in accordance with DC-ADM 803, "Inmate Mail and Incoming Publications";

    b. One newspaper (one-for one exchanges are permitted for newly received editions)

    c. Ten magazines (one-for-one exchanges are permitted for newly received publications).

---

19. DC-ADM 803 (effective June 24, 2002) establishes "policy and procedures governing inmate mail privileges and incoming publications."

20. Based on the Department of Corrections' oral representations to this Court and the District Court, we interpret the October 2001 policy to permit inmates to exchange religious or legal materials.

5. Inmates will be provided access to the facility law library by requesting legal materials in accordance with local procedures. Leisure reading material may be requested on a weekly basis from the library.

Additionally, each facility will establish procedures to permit inmates to exchange legal materials from their cells with stored legal materials once every 30 days.[21]

DC-ADM 802-10, "Administrative Custody Housing Status," amending section IV, M, subsections 4 and 5.

At oral argument on March 6, 2002, a Department of Corrections representative stated that under the new policy, the contents of inmates' records center boxes were "not examined." The Department of Corrections representative also explained that grievance procedures were available for inmates claiming the new policy was not being properly applied.

## III.

Our review of the District Court's grant of summary judgment is plenary. *Johnson v. Horn*, 150 F.3d 276, 281 (3d Cir. 1998). A grant of summary judgment is appropriate if there are no genuine issues of material fact[22] and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## A.

As a preliminary matter, we must determine whether the inmates' claims are moot because "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotations omitted); *see also Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993). An inmate's transfer from the facility complained of generally moots the

---

21. As noted, we interpret the October 2001 policy to permit inmates to exchange religious or legal materials.

22. At oral argument on March 6, 2002, both parties agreed that no issues of material fact remain.

equitable and declaratory claims. *Abdul-Akbar*, 4 F.3d at 197 (former inmate's claim that the prison library's legal resources were constitutionally inadequate was moot because plaintiff was released five months before trial). But these claims are not mooted when a challenged action is (1) too short in duration "to be fully litigated prior to its cessation or expiration"; and (2) "there [is] a reasonable likelihood that the same complaining party would be subjected to the same action again." *Id.* at 206; *see also Mesquite v. Aladdin's Castle Inc.*, 455 U.S. 283, 298 n.10 (1982). When there is a voluntary cessation of a policy, a claim will not be rendered moot if there remains the possibility that plaintiffs will be disadvantaged "in the same fundamental way." *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Instead, the dismissal of an action on mootness grounds requires the defendant to demonstrate that "there is no reasonable expectation that the wrong will be repeated." *Id.* (quotation omitted); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (discussing several factors, including "bona fides of expressed intent to comply, effectiveness of discontinuance, and, in some cases, character of past violations").

Here, none of the plaintiffs remains confined at SCI-Camp Hill, and class action status has not been sought. Wise and Sutton have been provided with the specific Nation of Islam books requested, and Walker has been released from prison. Since October 5, 2001, a new SMU policy has been in effect allowing inmates access to "any combination of personal property" that can fit into one records center box.[23] We are satisfied this one-box policy will not be rescinded based on the representations of the Department of Corrections made before us on March 6, 2002. Furthermore, there are strong administrative incentives making it unlikely that the new policy will be reversed.[24] We conclude plaintiffs no longer present a justiciable claim for declaratory and injunctive relief.

---

23. This policy is similar to one of plaintiffs' prior proposals.

24. Indeed, plaintiffs themselves recognized these incentives, stating "the primary impact . . . eliminating the rules restricting inmate access to religious books would have on guards and prison resources would be to *reduce* the amount of time and resources prison officials spend making decisions on whether books are 'religious' and whether they are particular inmates' 'main holy book.' "

But plaintiffs' damages claims are still extant. As noted, under the now-defunct SMU policy, SMU inmates in Phases IV and V were allowed access to one box of legal materials and a Bible, Qur'an or equivalent only. In Phase III, SMU inmates were allowed legal materials, a Bible, Qur'an or equivalent, as well as "[two] other religious reading materials (total [three])." In Phase II, SMU inmates were allowed legal materials, a Bible or Qur'an, and "[four] other religious materials."[25] But even though the prior SMU policy permitted access to additional "religious materials," plaintiffs were repeatedly denied access to Nation of Islam texts over a period of several years while SMU policy changes were being implemented. As noted, plaintiffs were not allowed access to books by Elijah Muhammad, among others, because prison officials determined they were not religious. Hence, plaintiffs' claims for damages remain despite their transfer out of the SMU and the recent policy changes.

**B.**

We now turn to defendants' contention that Commissioner Horn and Father Menei were not personally involved in the complained-of actions and are thus entitled to judgment in their favor.[26] Under our cases, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Here, there is no evidence that Commissioner Horn had any personal involvement in the application to plaintiffs of the challenged policies. Therefore, any damage claims against Commissioner Horn were properly dismissed. We find otherwise with respect to Father Menei. On July 4, 1994, Father Menei received from Sutton a letter, styled "Final Appeal of Grievance #94-0768," complaining that Imam Rasheed and Reverend Smith had denied him access to the Nation of Islam texts, pointing out that Imam Rasheed was a Sunni Muslim and

---

25. In Phase I, inmates were returned to their "designated institutions" and allowed general population privileges.

26. Defendants do not raise this argument with respect to the other individual defendants.

not an adherent of the Nation of Islam, and requesting access to the Nation of Islam material. Father Menei referred the matter to Reverend Smith, and, on the basis of Reverend Smith's memorandum (quoted *supra*), Father Menei wrote to Sutton denying his appeal because "[w]e have determined the books are *not* essentially religious in nature." He continued on to say "these books smack of racism and hatred, and I know of no God that wants us to worship him in this way." Because Father Menei appears to have played an active role, he was not entitled to summary judgment on the grounds that he was not personally involved.

## C.

We now address the merits of plaintiffs' free exercise claim that the Department of Corrections' prior regulations were unconstitutional, both as applied and facially. Plaintiffs, members of the Nation of Islam, allege that "they were unlawfully denied 'access to religious literature contained within [their] personal property while confined in the SMU at Camp Hill,' and, consequently, 'defendants prevented plaintiffs from practicing a central tenet of their faith.'" *Sutton*, No. 97-7906, at 1-2 (citation omitted). Defendants claim no constitutional violation occurred because there was a rational connection between the prison rules and a legitimate governmental interest in rehabilitation and security under *Turner v. Safley*, 482 U.S. 78 (1987).[27]

---

27. Defendants also contend that they are protected by qualified immunity from the damages claim. Prior to addressing that contention, however, we must first conclude that plaintiffs have alleged or evinced the violation of a constitutional right. *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'") (quoting *Conn v. Gabbert*, 526 U.S. 286 (1999)); *Jones v. Shields*, 207 F.3d 491 (8th Cir. 2000) (treating the "must" language in *Wilson* as mandatory); *Kitzman-Kelley v. Warner*, 203 F.3d 454, 457 (7th Cir. 2000) (same); *Hartley v. Parnell*, 193 F.3d 1263, 1270-71 (11th Cir. 1999) (same); *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1265-66 (9th

Before commencing the requisite *Turner* inquiry, we must first determine whether plaintiffs' request for the Nation of Islam texts stemmed from a constitutionally protected interest. *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000) (en banc) (explaining that if a prisoner's request is "not the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request, and there is no occasion to conduct the *Turner* inquiry"). The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. Only beliefs which are both "sincerely held"[28] and "religious in nature" are protected under the First Amendment. *DeHart*, 227 F.3d at 52. Purely secular views are not protected. *Frazee v. Ill. Dept. of Employment Sec.*, 489 U.S. 829, 833 (1989) ("There is no doubt that only beliefs rooted in religion are protected by the Free Exercise Clause . . . .") (quotation and citation omitted).

It is often difficult to determine whether a proffered viewpoint is in fact "religious" or "secular" in nature.[29]

Cir. 1999) (same). Other circuits have treated the "must" language in *Wilson* as describing what the courts ordinarily should do, rather than as a command. *See Kalka v. Hawk*, 215 F.3d 90, 95 (D.C. Cir. 2000) (treating *Conn* and *Wilson* as "not always requiring" federal courts to dispose of the constitutional claim before upholding a qualified immunity defense and assuming that "humanism" was a religion protected under the First Amendment before holding that federal prison officials were shielded by qualified immunity); *Horne v. Coughlin*, 191 F.3d 244, 246-47 (2d Cir. 1999) (discussing the doctrine of judicial restraint and observing that "where there is qualified immunity, a court's assertion that a constitutional right exists would be pure dictum . . . .").

We believe that the Supreme Court directive in *Wilson v. Layne* is mandatory. Accordingly, the District Court can decide the issue of qualified immunity only after it has concluded that a cause of action has been stated. Therefore, we initiate our inquiry by examining whether plaintiffs have alleged a constitutional violation.

28. The District Court found that plaintiffs sincerely believed in the teachings of the Nation of Islam, and defendants do not contest this. *Sutton*, No. 97-7096, at 5-6.

29. For a helpful discussion of the problems associated with defining the term "religion," *see generally* John Garvey & Frederick Schauer, *The First*

Nonetheless, we have tried our hand at defining "religion." *See Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981) (describing three indicia of religion).[30] The Supreme Court has provided some guidance on this question in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (concluding that Santeria, a hybrid African/Catholic faith mandating animal sacrifice, was a "religion" meriting First Amendment protection based partly on the "historical association between animal sacrifice and religious worship"). In *Hialeah*, the Court reasoned:

> The city does not argue that Santeria is not a "religion" within the meaning of the First Amendment. Nor could it. Although the practice of animal sacrifice may seem

*Amendment: A Reader* 595-96 (2d ed. 1996):

> We cannot apply the free exercise clause without understanding the meaning of its terms. The most difficult problems have concerned the meaning of the term "religion." This is an interpretative problem like the meaning of the word "speech" in the free speech clause. The First Amendment singles out some activities for special treatment, and leaves the rest to the weaker protection of the due process clause. It is thus very important to determine exactly what is covered.
>
> The increasing religious diversity of the United States makes this job much harder than it once was. Many free exercise claimants will not belong to well known denominations within the Judeo-Christian tradition . . . . It is difficult to find a common thread running through all these claims. To take only the most obvious example, many (like Buddhists) do not believe in God . . . . The First Amendment should not favor western religions, or traditional religions, over others. But neither can it extend protection to everyone who wants it. That would invite false claims for special treatment. It would also dilute the strength of the free exercise clause.

*See also* Kent Greenawalt, *Religion as a Concept in Constitutional Law*, 72 Cal. L. Rev. 753 (1984).

30. These indicia included: (1) an attempt to address "fundamental and ultimate questions" involving "deep and imponderable matters"; (2) a comprehensive belief system; and (3) the presence of formal and external signs like clergy and observance of holidays. *Id.*

> abhorrent to some, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981). Given the historical association between animal sacrifice and religious worship, petitioners' assertion that animal sacrifice is an integral part of their religion "cannot be deemed bizarre or incredible." *Frazee v. Illinois Dept. of Employment Security*, 489 U.S. 829, 834 n.2, 109 S.Ct. 1514 (1989). Neither the city nor the courts below, moreover, have questioned the sincerity of petitioners' professed desire to conduct animal sacrifices for religious reasons. We must consider petitioners' First Amendment claim.

*Hialeah*, 508 U.S. at 530 (citations omitted).

We too "must consider" plaintiffs' First Amendment claim. Nation of Islam Muslims believe in the teachings of the "One God whose proper Name is Allah," as they are contained in the Holy Qur'an, the Scriptures of all the Prophets of God, and the Bible. The Nation of Islam Online, *available at* http://www.noi.org (last visited Aug. 5, 2002). They believe that Allah (God) appeared in the person of Master W. Fard Muhammad in July 1930 and that Fard Muhammad is the long-awaited "Messiah" of the Christians and the "Mahdi" of the Muslims. *Id.* The official Nation of Islam website states that members want to establish a separate territory where black people can live independently and "believe the offer of integration is hypocritical and is made by those who are trying to deceive the black peoples into believing that their 400-year-old open enemies of freedom, justice and equality are, all of a sudden, their 'friends.'" *Id.* The central and foundational tenets of the Nation of Islam meet the definition of religion as set forth in *Hialeah* and *Africa*. Furthermore, we cannot say they are "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause." *Thomas*, 450 U.S. at 715. Therefore, we conclude that plaintiffs' sincerely-held views are sufficiently rooted in religion to merit First Amendment protection.

But "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *see also Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999) (prisoners' constitutional rights "are necessarily limited"). As we recently observed, "incarceration almost always results in a narrowing, not a broadening, of constitutional protections." *Fraise v. Terhune*, 283 F.3d 506, 515 n.5 (3d Cir. 2002). Although prison walls "do not form a barrier separating prison inmates from the protections of the Constitution," inmates' First Amendment rights "must in some respects be limited in order to accommodate the demands of prison administration and to serve valid penological objectives." *Id.* at 515 (quoting *Turner*, 482 U.S. at 84).

The Supreme Court has established that regulations reasonably related to legitimate penological interests generally pass constitutional muster. *See Turner*, 482 U.S. at 84; *O'Lone v. Shabbaz*, 482 U.S. 342 (1987). Under *Turner*, we must weigh four factors in making this determination:

> first, whether the regulation bears a "valid, rational connection" to a legitimate and neutral governmental objective; second, whether prisoners have alternative ways of exercising the circumscribed right; third, whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and fourth, whether alternatives exist that "fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests."

*Fraise*, 283 F.3d at 513-14 (quoting *Turner*, 482 U.S. at 89); *see also Wolf v. Ashcroft*, 297 F.3d 305, 310 (3d Cir. 2002) (discussing *Turner* in the context of a prison policy providing that no movies rated R, X, or NC-17 may be shown to inmates); *Waterman*, 183 F.3d at 212 ("Constitutional challenges to laws, regulations, and policies governing prison management must be examined under the framework of *Turner v. Safley* . . . .").

Under the first *Turner* prong, we accord great deference to the judgments of prison officials "charged with the formidable task of running a prison." *O'Lone*, 482 U.S. at 353; *see also Shaw*, 532 U.S. at 230 ("[U]nder *Turner* and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management") (quoting *Martinez*, 416 U.S. at 405 (" '[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' ")). The first factor is "foremost in the sense that a rational connection is a threshold requirement — if the connection is arbitrary or irrational, then 'the regulation fails, irrespective of whether the other factors tilt in its favor' . . . But, as we made clear in *DeHart*, we do not view it as subsuming the rest of the inquiry." *Wolf*, 297 F.3d at 310 (quoting *Shaw*, 532 U.S. at 229-30); *see also DeHart*, 227 F.3d at 52 (examining whether a prison regulation prohibiting a Buddhist inmate from following a vegetarian diet was justified by "legitimate and neutral concerns" under *Turner*).

The first *Turner* factor requires a "multifold" analysis: "we must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Thornburgh v. Abbott*, 490 U.S. 401, 414-15 (1989). Where "prison administrators draw distinctions between publications solely on the basis of their potential for prison security, the regulations are 'neutral' in the technical sense in which [the Supreme Court] meant and used the term in *Turner*." *Id.* at 415-16.

In this case, the prior version of DC-ADM 802 provided that inmates in restrictive status could have "no books other than legal materials and a personal Bible, Holy Koran or other religious equivalent." Similarly, DC-ADM 801 provided: "inmates will be permitted legal material that may be contained in one (1) records center box . . . . A personal Bible, a Holy Koran, or equivalent publication is permitted." As an inmate progressed to Phases III and II, additional religious texts were permitted.

Defendants assert the prior Department of Corrections policy of allowing prisoners in SMU Phases IV and V access to one box of legal materials and one Bible, Qur'an or

"equivalent" religious publication was rationally related to the penological goals of "maintaining a secure environment in the SMU (both concerning searches of cells and fire safety) and as an integral part of a global, behavior-driven program to encourage the most recalcitrant prisoners in the system to engage in more responsible and acceptable behavior." Defendants contend that, to the extent some of those inmates are religious, conditioning increased access to religious material on improved behavior served as an incentive for the desired behavior change because, once returned to the general prison population, the inmates would re-gain access to additional religious books. As the District Court found, "[t]he limit on the number of books in an SMU cell or the number of religious materials in general was just another incentive to improve the behavior of prisoners who behaved badly." *Sutton*, No. 97-7096, at 13.

Plaintiffs contend that defendants' "book ban" was "fundamentally irrational" because under these policies, essential Nation of Islam texts "were completely banned from all levels of the SMU, it did not matter how well plaintiffs behaved." In addition, they contend the ban was clearly "not neutral, and it was made only because of the content of the expression . . . . according to defendants, the books were 'not religious' and plaintiffs could not have them."

As noted, the prior Department of Corrections policy provided only that Phase V and Phase IV inmates could have a: "Bible, Quran, or equivalent." Once an inmate "graduated" from Phase IV to Phase III, he was entitled to "two additional religious texts"; in Phase II, "four additional religious texts"; and in Phase I (general population), no restrictions. Because the prison authorities found Nation of Islam texts "not religious," none were permitted at Phases II through V.

We need not address the facial challenge because in applying the policy, the Department of Corrections interfered with the free exercise of religion. The prison administrators impermissibly denied access to Nation of Islam materials because they improperly found the documents were not religious. On this point, the facts are

not in dispute.[31] It is difficult, therefore, to discern a legitimate penological interest in the denial of Nation of Islam texts to plaintiffs. Notwithstanding defendants' arguments and the deference we accord the judgment of prison officials, on balance, we believe that defendants cannot satisfy the first *Turner* prong.

The second *Turner* prong requires "a court to assess whether inmates retain alternative means of exercising the circumscribed right . . . . When assessing the availability of alternatives, the right in question must be viewed 'sensibly and expansively.' " *Fraise*, 283 F.3d at 518. The second factor is not "intended to require courts to determine whether an inmate's sincerely held religious belief is sufficiently 'orthodox' to deserve recognition." *DeHart*, 227 F.3d at 55. Under this factor, "we must of course focus on the beliefs of the inmate asserting the claim. It is obviously impossible to determine whether a regulation leaves an inmate with alternative ways of practicing the inmate's religion without identifying the religion's practices." *Fraise*, 283 F.3d at 518.

Here, the inmates in question are adherents of various Nation of Islam sects.[32] Nation of Islam members follow teachings contained in the "the Holy Qur'an, the Scriptures of all the Prophets, and in the Holy Bible." The Nation of Islam Online, *available at* http://www.noi.org (last visited

---

31. Imam Rasheed, while acknowledging that members of the Nation of Islam view themselves as Muslims, nonetheless concluded that the books were not "Islamic," because they did not comport with what he deemed the orthodox conception of Islam. Reverend Smith, beginning from the view that "[r]eligion, by definition, begins and ends with the search for and discovery of God," concluded "these books are not essentially religious in nature" because they referenced racial superiority and political activism. Father Menei echoed this view when he wrote that "these books smack of racism and hatred, and I know of no God that wants us to worship in this way."

We express no opinion on the restriction of religious materials that might advocate violence.

32. Sutton is a member of a Nation of Islam sect led by Minister Farrakhan, Wise is a member of the Lost-Found Nation of Islam, Inc., and Walker is a member of both.

Aug. 5, 2002). Plaintiffs' expert stated in her uncontradicted deposition testimony that the Nation of Islam books requested and denied were "essential religious texts of the Nation of Islam" and "required reading by the faithful," and that without them, "a person could not function well in the Nation of Islam's religious community." Consequently, plaintiffs contend that, under the prior policy, the "only form of religious expression available to plaintiffs and other members of the Nation of Islam is individual prayer in their cells, without the essential books to teach them how to pray."

This Court has held that in a free exercise case, we must consider whether the inmate has "alternate means of practicing his or her religion generally, not whether [the] inmate has alternative means of engaging in [any] particular practice." *DeHart v. Horn*, 227 F.3d 47, 55 (3d Cir. 2000) (en banc). In *DeHart*, we overruled the analysis in *Johnson v. Horn*, 150 F.3d 276 (3d Cir. 1998), that focused on " 'the centrality of the religious tenet' at issue and distinguished between 'religious commandments' and 'positive expression of belief,' suggesting that 'the importance of alternative means of religious observance is an irrelevant consideration' when the practice in question is a commandment." 227 F.3d at 54. We then said:

> Thus, under Johnson where the religious practice being prohibited by the prison is commanded by the believer's faith, the existence of other opportunities for exercising one's religious faith is wholly irrelevant to the analysis. The "religious commandment"/"positive expression of belief" distinction on which the panel in Johnson relied, however, directly conflicts with the Supreme Court's analysis in O'Lone. The Court there expressly held that, although attendance at Jumu'ah was a requirement of the respondents' religion (i.e., a "religious commandment"), because other means of practicing their religion were available, the second Turner factor weighed in favor of the relevant restriction's reasonableness. Recognition that a particular practice is required by an inmate's religion, thus, does not end this portion of the analysis. Rather, as the Supreme Court made clear in O'Lone and

> Thornburgh, courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question. . . . In this case, the record shows that, while the prison's regulations have prohibited DeHart from following a diet in conformity with his religious beliefs, he has some alternative means of expressing his Buddhist beliefs.

*Id.* at 55, 57.

We also said that where "other avenues remain available for the exercise of the inmate's religious faith, courts should be particularly conscious of the measure of judicial deference owed to correction officials. . . ." *Id.* at 59 (quoting *Turner*, 482 U.S. at 90) (internal quotations omitted).

Here, while the plaintiffs had access to the Bible and Qur'an, and could pray in their cells and celebrate Ramadan and other religious holidays, they were deprived of texts which provide critical religious instruction and without which they could not practice their religion generally.[33] In so concluding, we are mindful of *DeHart's*

---

33. The crucial religious significance of the writings that plaintiffs were foreclosed from reading is made plain by the expert report and deposition testimony of plaintiffs' expert, Dr. Aminah Beverly McCloud, an Assistant Professor in DePaul University's Department of Religious Studies. Professor McCloud, a specialist in Islamic studies, had this to say in her expert report:

    8.    The Nation of Islam is a religious community founded by Wali Fard Muhammad and developed by Elijah Muhammad. Within the Nation of Islam, Allah is God, Fard Muhammad is the Messiah, and Elijah Muhammad is a prophet. The teachings of Fard Muhammad and Elijah Muhammad are essential components of the religious beliefs and practices of the Nation of Islam.

    9.    Minister Louis Farrakhan is the religious leader of a prominent branch of the Nation of Islam. Like the teachings of Fard Muhammad and Elijah Muhammad, the teachings of Minister Farrakhan are an essential component of the religious beliefs and practices of this branch of the Nation of Islam.

proscription against drawing distinctions between "religious commandments" and "positive expressions of belief" in determining what religious practices may be curtailed by prison officials, and we do not here treat the reading of

10. I am familiar with Elijah Muhammad's books entitled *The Supreme Wisdom, Message to the Blackman in America, Our Savior Has Arrived, How to Eat to Live* and *The Fall of America*. It is my considered opinion that all of these publications are "religious" in nature. Indeed, all of Fard Muhammad's and Elijah Muhammad's teachings and writings are essential to the worldview of members of the Nation of Islam, and are undeniably religious to members of that community.

11. I am also familiar with the periodicals entitled *Muhammad Speaks* and *The Final Call*. These publications are also "religious" in nature.

12. Professor C. Eric Lincoln refers to two of the above religious publications on page 129 of the 1994 edition of his authoritative treatise, *The Black Muslims in America*:

In a book entitled *Message to the Blackman* (first published in 1965), [Elijah] Muhammad spelled out the essential doctrines of Black Islam as taught him by Fard, with his own elaborations. *Message to the Blackman* is required reading by the faithful, and it has found its way into the homes and libraries of non-Muslims. Since proper diet is a key aspect of Muslim commitment, *Message* was logically followed by a volume entitled *How to Eat to Live*, also by [Elijah] Muhammad. Together, these two books refine and extend the doctrines laid down in *The Supreme Wisdom*.

13. I agree with Professor Lincoln's characterization of *The Supreme Wisdom*, *Message to the Blackman* and *How to Eat to Live* as essential religious texts of the Nation of Islam. *Our Savior Has Arrived*, *The Fall of America*, *Muhammad Speaks* and *The Final Call* are also essential religious texts of the Nation of Islam.

14. For followers of Minister Farrakhan within the Nation of Islam, his writings are likewise essential religious texts.

15. Without these materials, a person could not function well in the Nation of Islam's religious community. To borrow Professor Lincoln's phrase, they are "required reading by the faithful."

On deposition the following colloquy was had:

Q. Does the Nation of Islam have what you refer to as inspired text?

these texts as religious commandments, but rather as a necessary element of exercising the right in question viewed "sensibly and expansively": the right to free exercise of the Nation of Islam faith.

We are also mindful of this Court's holding in *Fraise v. Terhune*, 283 F.3d 506 (3d Cir. 2002). There, this court said: "While the STG Policy forbids possession of distinctively Five Percent Nation literature, it is undisputed that the Policy allows inmates to possess, study, and discuss the Bible and the Koran. Accordingly, study of the Five Percent Nation's teachings is only partially restricted." *Id.* at 519. However, although *Fraise* refers to testimony identifying certain texts — *The 120 Degrees, Supreme Mathematics,* and *Supreme Alphabet* — which, like the Bible and the Qur'an, contain Five Percent teachings, *id.* at 511, nothing in *Fraise* purports to identify these or other items of "distinctively Five Percent literature" as having the sacrosanct and fundamental quality which the writings of the prophet, Elijah Muhammad, or the writings of Minister Farrakhan, have for members of one or another sect of the Nation of Islam. Those writings are, as plaintiffs' expert Professor Aminah Beverly McCloud explained, "not just the words of Elijah Muhammad or Louis Farrakhan. They are the words of Elijah Muhammad and Louis Farrakhan as inspired by God."[34]

In *O'Lone*, the Supreme Court held that the proper analysis of the second *Turner* prong required the Court not to determine if the inmates had alternative means to

---

    A. Yes. I would classify this set of texts as both scriptural and inspired because the members believe that these are not just the words of Elijah Muhammad or Louis Farrakhan. They are the words of Elijah Muhammad and Louis Farrakhan as inspired by God.

    Q. Okay. Are Elijah Muhammad's books religious both for Silas Muhammad's group based in Atlanta and Louis Farrakhan's group based in Chicago?

    A. Oh, yes.

34. *See* note 33, *supra.*

celebrate Jumu'ah, but rather whether they had alternative means to practice their religion in general. Because they teach adherents the proper way to pray and are viewed as divinely inspired, however, deprivation of the Nation of Islam texts in question here implicates not just the right to read those particular texts, but the prisoners' ability to practice their religion in general. To illustrate this principle, while we believe that a Christian inmate could practice his religion generally even if prevented from attending Christmas or Easter services, we do not believe he could practice his religion if deprived of access to the Bible. The distinction in this example is not between religious commandments and positive expressions of belief, but between the deprivation of a single aspect of religious worship and the removal of any ability to undertake the free exercise of the Christian religion generally.[35]

For example, had the plaintiff-inmates been Mormons, we do not think that prison authorities, in furtherance of a program of behavior modification, could, compatibly with the Constitution, have restricted the inmates' religious reading to the Old and New Testaments, withholding the inmates' own copies of *The Book of Mormon*.[36] There can be no fault line in the Constitution that would place the followers of Jesus Christ and Joseph Smith on the preferred side of the line and the followers of Elijah Muhammad and Louis Farrakhan on the other side. Therefore, because the original SMU policy deprived the plaintiffs of texts without which they could not practice their religion generally, we conclude that the second *Turner* prong favors the plaintiffs.

---

35. By the use of this example, we do not mean to imply that the deprivation of texts, as opposed to restrictions on religious practices, is more likely to mean that a prisoner cannot practice his religion generally. For example, we suspect that a complete prohibition on a Catholic's ability to attend Mass would mean a deprivation of his right to practice his religion generally, much as we would draw that conclusion about a regulation barring the inmate's access to the Bible.

36. *The Book of Mormon* is "accepted as holy scripture, in addition to the Bible, in the Church of Jesus Christ of Latter-day Saints and other Mormon churches." 8 New Encyclopaedia Britannica 329.

31

The final two *Turner* factors also favor plaintiffs. "The third and fourth factors . . . focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources." *DeHart*, 227 F.3d at 57.[37] Here, the consequences of accommodation appear de minimis and would not have a deleterious impact on prison personnel or resources. The Department of Corrections itself obviously did not consider the consequences of accommodation burdensome because they have changed their policy and adopted a policy similar to what plaintiffs sought. Prison resources are more efficiently allocated now because the one-box rule no longer requires prison administrators to make repeated individualized decisions about what are "religious" texts.

In sum, each of the four *Turner* factors — the existence of a legitimate and neutral government objective with regulations rationally related to that objective; whether there are alternative means of exercising the circumscribed right; the specific religious practice at issue; and the consequences of accommodating the inmate — weigh in favor of the plaintiffs' claim. For these reasons, we hold that, as applied to plaintiffs, the prior policy was constitutionally infirm under *Turner*.

## D.

But this does not end our analysis. We must also consider whether defendants are protected under the doctrine of qualified immunity.[38] *Wilson*, 536 U.S. at 609. Government officials performing discretionary functions, "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Abdul-Akbar*, 4 F.3d at 201-02 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982)). The right allegedly violated must be defined at the appropriate level of

37. Unlike *Fraise*, defendants concede the books at issue pose no security risks. *Sutton*, No. 97-7096, at 1.

38. Defendants were sued in their official and individual capacities. *Sutton*, No. 97-7096, at 1.

specificity before a court can determine if it was "clearly established." *Wilson*, 536 U.S. at 615; *see also Abdul-Akbar*, 4 F.3d at 202 (quoting *Good v. Dauphin County Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989) (explaining that the contours of the right must be sufficiently clear for "reasonable officials in the defendant's position at the relevant time [to] believe[ ], in light of what was in the decided case law, that their conduct would be unlawful")).

In this case, we must address defendants' claims of qualified immunity as they relate to damages claims asserted against them on the basis of their actions under the prior SMU policy and predicated upon decisions that Nation of Islam texts were "not religious."

The law in this area is murky. There has not always been a clear consensus whether the Nation of Islam is a religion for purposes of protection under the First Amendment. *See, e.g.*, *Cooper*, 855 F.2d at 127 (applying *O'Lone* and rejecting free exercise claims of Nation of Islam plaintiffs seeking to engage in group prayer); *Long v. Parker*, 390 F.2d 816, 819-20 (3d Cir. 1968) (describing the "Black Muslim" movement as "an alleged sect of the religion of Islam" and observing that it "cannot be classified as purely religious in nature," in part because the "inexorable hatred of white people" is a basic part of the faith) (quotation omitted);[39] *Cooper v. Pate*, 382 F.2d 518, 523 (7th Cir. 1967) ("Viewed as ordinary

_____

39. We do not agree with plaintiffs that *Long* "clearly established" a free exercise right that has been violated in this case, in part because *Long* was decided more than a decade before either *Turner* or *O'Lone*, two Supreme Court cases narrowing the scope of constitutional protection afforded inmates. In *Long*, we considered the claims of "Black Muslim" inmates contending they had been "unconstitutionally denied the right to receive and read authoritative publications of their religious sect, including the weekly newspaper 'Muhammad Speaks.' " *Id.* at 822. Access to this publication was restricted because of its alleged inflammatory nature. *Id.* We assumed without deciding that plaintiffs were entitled to the protections of the First Amendment because defendants did not challenge the legitimacy of treating Black Muslim beliefs as a religion. *Id.* at 819-820. After examining the inmates' claims, we required a hearing on the religious significance of "Muhammad Speaks." *Id.* at 822.

reading matter, with only slight relevance to religion, it would be most difficult to establish that exclusion of any [publications containing articles by Elijah Muhammad] from a prison is unlawful. Considered as religious material, one question would be whether material of the same degree of religious relevance is permitted prisoners of other faiths. And the extent or tone with which the race doctrine of this particular faith is emphasized would, we think, be a legitimate consideration."); *see generally Right to Practice Black Muslim Tenets in State Prisons*, 75 HARV. L. REV. 837, 837 40 (1962).

Nor have the courts always provided clear guidance on the question of what restrictions on prisoners' rights pass constitutional muster. *See, e.g., Hudson v. Palmer*, 468 U.S. 517, 523-34 (1984) ("[C]onstraints on inmates, and in some cases the complete withdrawal of certain rights, are justified by the considerations underlying our penal system . . . ."); *Canedy v. Boardman et al*, 91 F.3d 30, 34 (7th Cir. 1996) ("But in 1992, the time of the events in question here, it was not at all clear that [plaintiff's interest in observing Islam's nudity taboos] decisively outweighed [the interests] of the prison."); *Wilson v. Prasse*, 463 F.2d 109, 111 (3d Cir. 1972) ("The question of the distribution of Muslim literature [including the writings of Elijah Muhammad] among prison populations is not free from difficulty."); *Cooper*, 855 F.2d at 129 ("While plaintiffs invoke the highest principles of our law, they are dangerous persons who even among inmates convicted of the most serious offenses were singled out for special security treatment . . . . Clearly, there is a valid, rational reason for not permitting plaintiffs to establish an infrastructure within the [restrictive custody unit] and have it openly function merely because plaintiffs claim a right to engage in their activities on the basis of their religion.") (citing *O'Lone*, 482 U.S. at 342); *Knuckles v. Prasse*, 302 F.Supp. 1036, 1050 (E.D. Pa. 1969) (Higginbotham, J.) ("Since the [Black Muslim] literature could be subject to inferences urging [defiance of whites] . . . I rule that it is not necessary that the prison authorities make available to prisoners the writings"), aff'd 435 F.2d 1255 (3d Cir. 1970).[40]

---

40. *Cf. Williams v. Lane*, 851 F.2d 867, 878 (7th Cir. 1988) (examining the rights of inmates in protective custody status, which is made

Accordingly, it is questionable whether the likely invalidity of the application of the Department of Corrections' SMU policy was clearly established so that it should have been apparent to defendants. *Cf. Abdul-Akbar*, 4 F.3d at 205 ("Indeed, if members of the judiciary cannot reach a clear consensus regarding '[t]he contours of the right' . . . can we reasonably expect more from those who are required to implement those rights?") (citation and quotation omitted); *see also Kalka*, 215 F.3d at 99 ("Given the judiciary's exceedingly vague guidance, in the face of a complex and novel question, the actions of the defendants therefore did not violate 'clearly established' law."). Furthermore, the first and second prongs of the *Turner* analysis present close calls on these facts, especially in light of the great deference we accord the judgments of prison officials.

For these reasons, we hold that the defendants are protected by qualified immunity from plaintiffs' damages claims.

---

available to inmates who fear for their own safety); *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987) (addressing a "ban" of Church Jesus Christ Christian books touting white supremacy from a prison library and holding "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation"); *Murphy v. Mo. Dep't of Corrections*, 814 F.2d 1252, 1256 (8th Cir. 1987) (concluding that a total ban of Aryan Nations materials "is too restrictive a mail censorship policy"); *Rowland v. Jones*, 452 F.2d 1005, 1006 (8th Cir. 1971) ("We reject as an intrusion of a prisoner's First Amendment rights the granting of possession of some [religious medallions] and not others contingent upon their meeting an official standard of religious orthodoxy."); *Walker v. Blackwell*, 411 F.2d 23, 29 (5th Cir. 1969) ("The order is merely to direct that the warden not arbitrarily deny Black Muslims the right to read [the "Muhammad Speaks" newspaper], within the normal framework of prison rules and regulations, administration and security."); *Sostre v. McGinnis*, 334 F.2d 906, 911 (2d Cir. 1964) ("In other words the nub of this situation is not to be found in the existence of theoretical rights, but in the very practical limitations on those rights which are made necessary by the requirements of prison discipline").

**IV.**

Therefore, we will affirm the District Court's entry of summary judgment. Parties to bear their own costs.

SCIRICA, *Circuit Judge*, concurring:

Although I believe the revised Department of Corrections policy represents the better practice and avoids potential problems in the free exercise of an inmate's religion, I believe the prior policy was facially valid. But the prison administrators impermissibly denied access to Nation of Islam materials because they found, improperly in my view, that the documents did not constitute religious material. For this reason, I agree that the prior policy was unconstitutional as applied.

## I.

But it seems to me that under *Turner v. Safley*, 482 U.S. 78 (1987), the prison authorities promulgated a rational and neutral policy, reasonably grounded on behavior modification principles. Arguably, had the corrections officials adopted a broader view of "religion," the Nation of Islam materials, at least, in Phases III and II would have been permitted. And depending on whether the officials considered Nation of Islam materials the equivalent of the Bible or Qur'an, they could have been permitted at Phases V and IV.

Under an expansive interpretation of what constitutes religious materials, therefore, the prior policy arguably could be rational and neutral, and reasonably grounded on acceptable behavior modification principles. Department of Corrections Regional Deputy Commissioner Dr. Beard explained that this incentive-based program was developed to improve upon traditional restrictive housing units which were not programmed to address the needs of inmates with a long-term inability to adjust to general population status. To this end, the SMU "provide[d] structured progression through five phases . . . . The program provide[d] security for staff and inmates alike while giving the inmate an incentive to progress through the phases of the program . . . ." To the extent that some of those inmates were religious, conditioning access to religious materials on

improved behavior might very well have served as a powerful incentive for the desired change in behavior.[1]

Furthermore, the District Court found that "the SMU rules were not created to target [Nation of Islam] members, and the rules applied to each prisoner no matter what his religion." *Sutton*, No. 97-7096, at 12. It bears noting as well that as the prisoner progressed through administrative confinement, he regained other privileges besides access to additional religious materials. For these reasons, defendants have arguably demonstrated a "valid, rational connection" to the "legitimate and neutral governmental objective" of behavior modification. *Cf. Thornburgh v. Abbott*, 490 U.S. 401, 414-15 (1989).

## II.

I also believe that the second *Turner* prong favors defendants. As the court notes, in a free exercise case, we must consider whether the inmate has "alternate means of practicing his or her religion generally, not whether [the] inmate has alternative means of engaging in [any] particular practice." *DeHart v. Horn*, 227 F.3d 47, 55 (3d Cir. 2000) (en banc). "When assessing the availability of alternatives, the right in question must be viewed 'sensibly and expansively.'" *Fraise*, 283 F.3d at 518 (quoting *DeHart*, 227 F.3d 53-55). In *DeHart*, we overruled the analysis in *Johnson v. Horn*, 150 F.3d 276 (3d Cir. 1998), that focused on "'the centrality of the religious tenet' at issue and distinguished between 'religious commandments' and 'positive expression of belief,' suggesting that 'the importance of alternative means of religious observance is an irrelevant consideration' when the practice in question is a commandment." 227 F.3d at 54. We then said:

> Thus, under *Johnson* where the religious practice being prohibited by the prison is commanded by the

---

1. As the District Court found, the SMU incentive-based program was "very successful" because from "April 1992 to October 1993 of the 45 inmates admitted to the program 19 graduated to general population status and only 3 of those had [to] be returned to the SMU." *Sutton*, No. 97-7096, at 12.

> believer's faith, the existence of other opportunities for exercising one's religious faith is wholly irrelevant to the analysis. The "religious commandment"/"positive expression of belief" distinction on which the panel in *Johnson* relied, however, directly conflicts with the Supreme Court's analysis in *O'Lone*. The Court there expressly held that, although attendance at Jumu'ah was a requirement of the respondents' religion (i.e., a "religious commandment"), because other means of practicing their religion were available, the second *Turner* factor weighed in favor of the relevant restriction's reasonableness. Recognition that a particular practice is required by an inmate's religion, thus, does not end this portion of the analysis. Rather, as the Supreme Court made clear in *O'Lone* and *Thornburgh*, courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question. . . . In this case, the record shows that, while the prison's regulations have prohibited DeHart from following a diet in conformity with his religious beliefs, he has some alternative means of expressing his Buddhist beliefs."

*Id.* at 55, 57.

We further said that where "other avenues remain available for the exercise of the inmate's religious faith, courts should be particularly conscious of the measure of judicial deference owed to correction officials. . . ." *DeHart*, 227 F.3d at 59 (quoting *Turner*, 482 U.S. at 90) (internal quotations omitted). The second factor is not "intended to require courts to determine whether an inmate's sincerely held religious belief is sufficiently 'orthodox' to deserve recognition." *DeHart*, 227 F.3d at 55. Under this factor, "we must of course focus on the beliefs of the inmate asserting the claim. It is obviously impossible to determine whether a regulation leaves an inmate with alternative ways of practicing the inmate's religion without identifying the religion's practices." *Fraise*, 283 F.3d at 51.

In *Fraise*, we concluded the second *Turner* prong was

satisfied where inmates' access to Five Percent[2] literature was only "partially restricted." *Id.* at 519. The *Fraise* prison regulations allowed New Jersey correctional officers to designate security threat groups (STGs) and transfer core members to a special unit where their ability to "study the lessons" (a central Five Percent practice) was strictly controlled for fear of gang violence linked with the group. *Id.* Although Five Percenters were not allowed possession of "distinctively Five Percent Nation literature," they were still permitted to "possess, study and discuss" the Bible and the Qur'an. *Id.* We stated, "To be sure, the STG Policy restricts the ability of Five Percenters to achieve [self-knowledge, self-respect, responsible conduct or righteous living] by following what the group may regard as the best avenue, i.e., by studying and discussing doctrines and materials distinctive to the Five Percent Nation. But alternative avenues clearly remain open." *Id.*

As the court notes, the inmates in question here are adherents of various Nation of Islam sects.[3] Plaintiffs' expert opined that the Nation of Islam Books requested were "essential" to the practice of their religion. But alternative means of worship were clearly available to the plaintiffs. Even though plaintiffs were denied access to distinctly Nation of Islam texts, they were still allowed access to the Qur'an or Bible, like the *Fraise* inmates. As the District Court found, Nation of Islam members in the SMU were "permitted to exchange books, e.g., the Bible for the Koran . . . . and [t]hey could celebrate religious holidays such as Ramadan in the company of other prisoners." *Sutton*, No. 97-7096, at 5. Thus, SMU inmates had access to the Bible, Qur'an, or equivalent religious texts, and they could pray

---

2. The Five Percenters broke away from the Nation of Islam in the 1960s. They believe in a "Supreme Mathematics." The "Five Percent" includes African Americans who have achieved self-knowledge. *Fraise*, 283 F.3d at 511. Five Percenters "reject[] belief in the transcendent and instead focus[] on human enlightenment and conduct as ends in themselves." *Id.* at 518 (examining evidence of the Five Percenters beliefs and practices as submitted by an editor of a Five Percent newspaper).

3. Sutton is a member of a Nation of Islam sect led by Minister Farrakhan, Wise is a member of the Lost-Found Nation of Islam, Inc., and Walker is a member of both.

by themselves, speak with and be visited by religious advisors, and celebrate religious holidays. *Cf. Fraise v. Terhune*, 283 F.3d 506, 519-20 (upholding a prison policy in an as-applied challenge where inmates in restrictive custody were only "partially restricted" in their ability to practice religion because "the policy allowed inmates to possess, study and discuss the Bible and the Koran" and did not restrict religious inmates from seeking "self-knowledge" or "righteous living"). While the original SMU policy undoubtedly imposed restrictions on the ability of Nation of Islam members to engage in activities related to the group, plaintiffs retained sufficient alternative means of studying and practicing doctrines distinct to their religion.[4] *Cf. Fraise*, 283 F.3d at 520. I see no principled distinction here from the circumstances we faced in *Fraise*, which found that sufficient alternative means of worship were retained. Therefore, I believe the second *Turner* prong favors defendants here.

In all other respects, I join the court's opinion.

A True Copy:
　　Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

4. As noted, we said in *DeHart*, "[T]he Supreme Court made clear in O'Lone and Thornburgh, courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." 227 F.3d at 55.